[No. D031946. Fouth Dist., Div. One. Feb. 2, 2000.]

PARDEE CONSTRUCTION COMPANY, Plaintiff and Appellant, v. INSURANCE COMPANY OF THE WEST et al., Defendants and Respondents.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and IV.

## COUNSEL

Mower, Koeller, Nebeker, Carlson & Haluck, Robert C. Carlson, Megan K. Dorsey, Laura T. Barton and Jay M. Bulger for Plaintiff and Appellant.

Newmeyer & Dillion, Gregory L. Dillion, Gene M. Witkin and Timothy S. Menter for Fieldstone Communities, Inc., William Lyon Homes, Inc., Catellus Development Corporation, Kaufman and Broad Home Corporation, New Urban West, Inc., Presley Homes and Standard Pacific Corp. as Amici Curiae on behalf of Plaintiff and Appellant.

Edwards, Sooy & Byron, Michael M. Edwards, Napoleon L. D. Taylor, Thomas W. Byron for Defendants and Respondents Insurance Company of the West and U.S. Fire Insurance Company.

Kern & Wooley, Ronald J. Skocypec, Susan T. Olson and Lisa Kralik Hansen for Defendants and Respondents Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company.

Daniels, Baratta & Fine, James M. Baratta and Robin A. Webb for Defendant and Respondent Nationwide Mutual Insurance Company

Law Offices of Glenn M. White, Glenn M. White and John J. Druci for Golden Eagle Insurance Company as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**WORK, J.**—The primary issue presented by this appeal is whether insurers that have issued commercial general liability (CGL) policies to subcontractors, including completed operations coverage as to projects completed

before their inception, owe a duty to defend the additionally insured general contractor in third party litigation asserting its vicarious liability for their acts. Here, where the insurers acknowledge the subcontractors had such completed operations coverage for the project that gave rise to the underlying litigation, we conclude that absent language excluding such coverage in the policies, certificates and endorsements the insurers owe the general contractor a duty to defend.

Pardee Construction Company (Pardee) appeals judgments for four insurers, Liberty Mutual Insurance Company (Liberty), Insurance Company of the West (ICW), Nationwide Mutual Insurance Company (Nationwide) and U.S. Fire Insurance Company (U.S. Fire), dismissing its claims against them for breach of contract, bad faith, fraud and indemnity. The judgments were entered after the trial court declared the insurers did not owe a duty to defend Pardee, an additional insured under each CGL policy, in an underlying action alleging defective construction of a Pardee development. After Heritage Concord Square Unit II Community Association (Association) brought that action (Super. Ct. San Diego County, 1995, No. 695782) (Heritage II action), Pardee tendered its defense, as an additional insured, to the four insurers under policies issued to its subcontractors whose work on the project was allegedly defective. Each insurer denied coverage and/or failed to acknowledge its obligation to defend Pardee. Pardee challenges the trial court ruling that no insurer had a duty to defend it as an additional insured, because the policies did not incept until after the construction project on which the action was based was completed and the parties did not intend these policies to provide coverage for that project. Pardee also contests the court's orders granting the insurers' demurrers as to its fraud cause of action and their motions for judgment on the pleadings as to its remaining causes of action.

As we shall explain, we conclude the clear and unambiguous language of the policies, certificates and endorsements of ICW, Nationwide and U.S. Fire provide Pardee completed operations coverage as to the named insured subcontractors and thus a duty to defend this Heritage II action. Accordingly, we reverse the judgments for those insurers. However, as to Liberty, we conclude the trial court correctly found the allegations in the complaint regarding its insured subcontractor, supplemented by the surrounding extrinsic evidence, do not give rise to any potential for coverage. Therefore, we reverse the judgments in their entirety as to ICW, Nationwide and U.S. Fire and direct the trial court to grant Pardee's motions for summary adjudication as to their duty to defend as to ICW and Nationwide. With regard to U.S. Fire, the trial court is directed to address whether Pardee complied with any self-insured retention obligation in reexamining the parties' motions for summary adjudication. The judgment on behalf of Liberty is affirmed.

# I

## FACTUAL AND PROCEDURAL BACKGROUND

In the mid to late 1980's, Pardee as developer and general contractor built the multiphase Heritage Concord Villas project (Heritage project) in the Mira Mesa area of San Diego. It hired subcontractors to construct and install each component of the project, including the stucco, landscaping, concrete, insulation and mechanical components, generally pursuant to one subcontract that remained in force during the six phases of construction. As the construction was completed on the various phases, three separate homeowners associations were formed. The underlying construction defect litigation here was brought by the second of the three associations, the Association, regarding the third and fourth phases of the Heritage project (Heritage II project).

Pardee subcontracted with Schmid Insulation (Schmid) to install all insulation pursuant to a subcontract dated October 1, 1985. In the same year, Pardee hired Strang Heating and Air Conditioning (later renamed Strang Mechanical, Inc. (Strang)) pursuant to two separate subcontracts to supply and install all sheet metal and heating/air conditioning systems. By contract dated October 1, 1985, Pardee contracted with Coast Plastering, Inc. (Coast) to complete the stucco and plastering work on the project. R. E. Hazard Contracting Company (Hazard) was responsible for the asphalt paving and concrete installation under a December 19, 1985, subcontract agreement, signed by Hazard in January, 1986. Finally, Pardee contracted with Doose Landscape (Doose) to supply and install landscaping, hardscape, drainage, backfill, retaining walls and irrigation, as well some fine grading and exterior site electrical work pursuant to several contracts dated from December 27, 1985, through August 20, 1987.

Each subcontract required that the subcontractor obtain general liability insurance naming Pardee as an additional insured on all policies for work performed on the Heritage project, including completed operations. The insurance clause provided: "Subcontractor shall at all times maintain in effect throughout the performance of this agreement workers' compensation insurance, as required by law covering all employees. Subcontractor shall also at all times maintain in effect bodily injury and property damage liability insurance for (a) all operations, (b) subcontract work, (c) contractual obligations, (d) products and completed operations, (e) all vehicles, and (f) non-owned vehicles. Bodily injury liability, including auto, shall be in the amounts of $500,000/$1,000,000. Property damage liability, including auto, shall be in the amount of $300,000. All such insurance shall be written in form and underwritten by companies approved by Pardee, and will name Pardee as an additional insured. Subcontractor shall deliver to PARDEE

certificates evidencing all such insurance issued by the insurers prior to commencement of the work. Failure of the Subcontractor to deliver all such certificates by the time Subcontractor is to commence the work shall be a default under this agreement."

ICW insured Coast and Strang. However, neither Coast nor Strang was insured by ICW in 1985 when their subcontracts with Pardee were executed. In fact, when the Heritage project was completed on March 15, 1988, no ICW policy had yet been issued to them. ICW issued a CGL policy to Strang on July 1, 1988, which continued in effect until July 1, 1990. Pardee was named an additional insured under the policy. ICW also issued a CGL policy to Coast for the period April 21, 1992, through April 21, 1993. Although no additional insured endorsement naming Pardee was issued by ICW under the policy, Pardee did receive a certificate of insurance, dated May 13, 1992, naming it as an additional insured for all operations and all jobs.[2]

Nationwide insured Doose and Coast. Again, however, neither Doose nor Coast was insured by Nationwide at the time the subcontracts were entered into or before completion of all work required of Doose and Coast. Nationwide insured Doose from December 31, 1990, through December 31, 1993. Pardee was named as an additional insured under endorsements issued for each of the three years the policy was in effect, which provided Pardee coverage to the extent it is held liable for Doose's acts or omissions arising out of and in the course of operations performed for Pardee. Nationwide insured Coast from February 1, 1988, through February 1, 1989, and from March 1, 1989, through March 1, 1990. Pardee was named as an additional insured for the two years of coverage, but only for liability arising out of Coast's work performed for Pardee.

Liberty insured Schmid, naming Pardee as an additional insured in its policies for the policy periods June 1, 1986, through June 1, 1988.

U.S. Fire insured Hazard. Approximately four years after the Heritage project was completed and while Hazard was working on a different construction project for Pardee, U.S. Fire in 1992 began to provide Hazard with

[2]Subcontractors are often required contractually to name the project owner and/or the general contractor as additional insureds under their CGL policies. Compliance is confirmed by issuing policy endorsements to the additional insured parties. They often do not receive the actual endorsement, but rather are notified by way of a certificate of insurance. (O'Connor, *Commercial General Liability Coverage* (Apr. 1999) 19 Construction L., 5, 12-13.) "A certificate of insurance is merely evidence that a policy has been issued. (Ins. Code, § 384.) It is not a contract between the insurer and the certificate holder. [Citations.]" (*Empire Fire & Marine Ins. Co. v. Bell* (1997) 55 Cal.App.4th 1410, 1423, fn. 25 [64 Cal.Rptr.2d 749].)

liability insurance coverage, naming Pardee as an additional insured. It continued to do so for five policy periods from May 8, 1992, through May 8, 1997.

On December 27, 1995, the Association sued Pardee for breach of implied warranties, strict liability and negligence, seeking to recover damages from it arising out of its subcontractors' work and/or materials in connection with the construction of the condominium units and common areas. The Association alleged numerous construction defects, including, among others, defects relating to the concrete, stucco, landscaping, sheet metal, insulation and HVAC/mechanical systems. Pardee tendered its defense in the underlying action to each insurer. Each insurer denied and/or failed to accept Pardee's tender. Pardee was partially defended by other additional insured carriers; however, its defense was not fully funded and it incurred out-of-pocket expenses for its defense. The matter was resolved by settlement, and Pardee paid part of the total settlement.

On April 18, 1997, Pardee sued ICW, Nationwide, Liberty and U.S. Fire, among other defendants. The fourth amended (and operative) complaint alleged breach of contract, breach of the duty of good faith and fair dealing, fraud and declaratory relief as to the duty to defend and the duty to indemnify. The complaint alleged these causes of action within the context of the refusal of each insurer to defend and indemnify Pardee in the underlying action. The trial court sustained the demurrers of ICW and U.S. Fire to the fraud cause of action without leave to amend because Pardee had failed to properly allege damages. In late February 1998, Pardee moved for summary adjudication as to the insurers' duty to defend it under the circumstances. The parties filed cross-motions for summary adjudication on the declaratory relief cause of action regarding the duty to defend. On April 10, the trial court telephonically granted the insurers' motions for summary adjudication, reasoning the policies did not incept until after construction of the project was complete and thus were not issued to provide Pardee coverage as to it. However, as to Liberty, the trial court granted its motion, ruling the allegations in the complaint as to Schmid, supplemented by extrinsic evidence, do not give rise to the possibility or potential for coverage. At Pardee's request, the trial court heard oral argument on the cross-motions and confirmed its ruling. Pardee unsuccessfully sought writ of mandamus relief and a new trial. The insurers then successfully moved for judgment on the pleadings, claiming the ruling of no defense obligation necessarily required dismissal of the remaining causes of action. After entry of separate judgments for each of the insurers, Pardee timely appealed from each of the four judgments entered.

## II

■■■ WHETHER THE TRIAL COURT CORRECTLY
RULED THE INSURERS HAD NO DUTY TO DEFEND[3]

Collectively and correctly,[4] ICW, Nationwide and U.S. Fire argue the determinative issue here involves not the "continuous trigger" principles or

[3]The parties agree the applicable standard of review here is de novo review. (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1074 [85 Cal.Rptr.2d 627]; *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 873 [60 Cal.Rptr.2d 830].)

To prevail on a motion for summary judgment, a defendant must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense to that cause of action. (*Bacon v. Southern Cal. Edison Co.* (1997) 53 Cal.App.4th 854, 858 [62 Cal.Rptr.2d 16]; Code Civ. Proc., § 437c, subd. (o)(2).) "On review of a summary judgment in favor of the defendant, we review the record de novo to determine whether the defendant has conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207].) The evidence of the moving party is strictly construed and that of the opponent is liberally construed, and any doubts as to the propriety of granting the motion are to be resolved in favor of the party opposing the motion. (*Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 189 [43 Cal.Rptr.2d 392].)

Summary judgment should be granted only when a moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) Mindful that summary judgment raises only questions of law, we independently review the parties's supporting and opposing papers and apply the same standard as the trial court in determining whether there exists a triable issue of material fact. (*City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, 583 [35 Cal.Rptr.2d 876]; *Southern Cal. Rapid Transit Dist. v. Superior* Court (1994) 30 Cal.App.4th 713, 723 [36 Cal.Rptr.2d 665]; *Planned Parenthood v. City of Santa Maria* (1993) 16 Cal.App.4th 685, 690 [20 Cal.Rptr.2d 391].) The summary judgment process undertakes to expedite litigation and eliminate needless trials. (*King v. Andersen* (1966) 242 Cal.App.2d 606, 610 [51 Cal.Rptr. 561]; *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 590 [52 Cal.Rptr.2d 877].) However, the process should be used with caution because it is a drastic measure depriving the losing party of a trial on the merits. (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

The first step in reviewing a summary judgment in favor of defendant is to " 'identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the [complaint].' " (*Carleton v. Tortosa* (1993) 14 Cal.App.4th 745, 752 [17 Cal.Rptr.2d 734], quoting *AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].) Here, our principal task of interpreting the insurance policies constitutes a question of law that, we reiterate, we resolve de novo. (*Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 325 [81 Cal.Rptr.2d 557].) Needless to say, "[t]he trial judge's stated reason for granting summary judgment is not binding on us because we review its ruling, not its rationale." (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co., supra,* 72 Cal.App.4th at p. 1074.)

[4]The insurers correctly reject Pardee's assertion the central issue of this insurance coverage appeal is whether the precedent of *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose I*) and *Montrose Chemical*

the intricacies of the duty to defend, but rather simply the application of basic contract interpretation principles to the insurance policies in controversy. Applying them and emphasizing the policies incepted after completion of the Heritage II project, they assert the trial court correctly concluded the contract language, and extrinsic evidence if necessary to resolve any ambiguity, establish the parties did not intend the additional insured endorsements would provide Pardee with coverage here.[5] In a similar vein, Pardee and supporting amici curiae respond the plain language of the policies and endorsements compel the conclusion it is covered here. They argue the endorsements amend the policies to include Pardee as an additional insured and, because the policies cover the named insureds for completed operations unlimited by time or project, Pardee is covered for damages caused by the subcontractors' work without regard to when the work was completed.

## The Duty to Defend

Preliminarily, it is firmly established the duty to defend is broader than the obligation to indemnify. The former arises whenever an insurer ascertains facts that give rise to the possibility or the potential of liability to indemnify. Unlike the duty to indemnify which arises only when the insured's underlying liability is established, the duty to defend must be assessed at the very outset of a case. The determination whether an insurer owes a duty to defend is made in the first instance by comparing the terms of the policy with the allegations of the complaint. Facts extrinsic to the complaint give rise to a duty to defend when they reveal the possibility the claim may be covered by the policy. Conversely, where such facts eliminate the potential for coverage, the insurer may decline to defend even where the bare allegations of the complaint suggest potential liability. This is so because the duty to defend, although broad, is not unlimited, but rather measured by the nature and kinds of risks covered by the policy. An insurer may have a duty to defend even though it ultimately may have no obligation to indemnify, either because no damages are awarded in the underlying matter against the insured or because the actual judgment is for damages not covered under the policy. Finally, the duty to defend is a continuing one, arising upon tender and lasting until the underlying litigation is resolved, or until the insurer has established there is no potential for coverage. (*Montrose II, supra,* 10 Cal.4th at p. 659, fn. 9; *Montrose I, supra,* 6 Cal.4th at pp. 295,

*Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose II*) apply to it as an additional insured pursuant to an additional insured endorsement. Pardee hypothesizes that if these cases apply equally to insureds added by endorsement, then the trial court erred in granting summary adjudication in favor of the insurers as each had a duty to defend it.

[5] For the purposes of this appeal, the insurers concede Pardee is an additional insured.

299-300; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792]; *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 274, 276 [54 Cal.Rptr. 104, 419 P.2d 168]; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Borg v. Transamerica Ins. Co.* (1996) 47 Cal.App.4th 448, 454-455 [54 Cal.Rptr.2d 811].)

Equally established is that "when a suit against an insured alleges a claim that potentially or even possibly could subject the insured to liability for covered damages, an insurer must defend unless and until the insurer can demonstrate, by reference to undisputed facts, that the claim *cannot* be covered." (*Borg v. Transamerica Ins. Co.*, *supra*, 47 Cal.App.4th at p. 455.) For example in a declaratory relief action, "[t]o prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales. Any seeming disparity in the respective burdens merely reflects the substantive law." (*Montrose I*, *supra*, 6 Cal.4th at p. 300.) "A duty to defend does not exist only when the underlying complaint ' ". . . *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*" ' [Citations.] For this reason, where there is any doubt as to whether the duty to defend exists, that doubt must be resolved in favor of the insured and against the insurer. [Citations.]" (*Borg v. Transamerica Ins. Co.*, *supra*, 47 Cal.App.4th at p. 455; *Maryland Casualty Co. v. National American Ins. Co.* (1996) 48 Cal.App.4th 1822, 1831 [56 Cal.Rptr.2d 498].)

### General Principles of Interpreting Insurance Policies

 "When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.] The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.]" (*Waller v. Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 18.) Consequently, in resolving whether the allegations in a complaint give rise to coverage under a CGL policy, we must consider the occurrence language in the policy, as well as the endorsements, if any, that broaden coverage included in the policy terms. (*Ibid.*)

■ The fundamental rules governing the interpretation of contracts apply equally to the construing of insurance contracts. They are premised on the primary goal of giving effect to the mutual intention of the parties at the time the contract is formed. That intent is to be inferred, if possible, solely from the written provisions of the contract. If the language of the insurance contract is clear and explicit, it governs. Indeed, judicial interpretation is controlled by the clear and explicit meaning of the language of a contract, interpreted in its ordinary and popular sense, unless the parties intended a technical sense or a special meaning by usage. If the meaning a layperson would ascribe to insurance contract language is not ambiguous, then the courts will apply it regardless whether legally trained observers would perceive the language as raising doubts as to coverage due to sophisticated legal distinctions. In other words, whatever ambiguity may attach to contract language due to a party's legal knowledge is resolved in favor of coverage. (*Vandenberg v. Superior* Court (1999) 21 Cal.4th 815, 839-840 [88 Cal.Rptr.2d 366, 982 P.2d 229]; *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265]; *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18; Civ. Code, §§ 1636, 1638, 1639, 1644.)

■ " 'A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.' [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does '[d]isagreement concerning the meaning of a phrase,' or ' "the fact that a word or phrase isolated from its context is susceptible of more than one meaning." ' [Citation.] ' "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." ' [Citation.] 'If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' [Citation.]" (*Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra,* 18 Cal.4th at p. 868.)

However, before doing so, in order to protect the objectively reasonable expectations of the insured, the courts endeavor to interpret the ambiguous language in the sense in which the insurer believed, at the time of making it, the insured understood it. Only if this approach does not resolve the ambiguity, do the courts then resolve it against the insurer. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Reliance Nat. Indemnity Co. v. General Star Indemnity Co., supra,*

72 Cal.App.4th at p. 1074.) "In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. [Citation.]" (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265.) "Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 18-19.) Simply stated, "[a]n insurer has a duty to defend when the policy is ambiguous and the insured would reasonably expect the insurer to defend him or her against the suit based on the nature and kind of risk covered by the policy, or when the underlying suit potentially seeks damages within the coverage of the policy. [Citations.]" (*Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra,* 18 Cal.4th at p. 869.)

### *ICW, Nationwide and U.S. Fire Owed Pardee a Duty to Defend Under Their Policies*

In ruling on behalf of ICW, Nationwide and U.S. Fire, the trial court reasoned the insurers had no duty to defend Pardee under the policies because they incepted well after completion of the Heritage II project. The court noted each subcontractor entered into similar subcontracts with Pardee requiring it to obtain liability insurance naming Pardee as an additional insured before starting work on the project, and that failure to deliver such certificates of insurance at that time constituted default under the subcontract. However, all of the tendered policies at issue here incepted well after the Heritage II project was completed on March 15, 1988. The court concluded the policies naming Pardee as an additional insured could not be construed to provide coverage for the Heritage II project, which was completed well before the effective dates of the policies. The court found that while the subcontracts clearly required insurance, the tendered policies were not issued to provide such coverage for the project.[6]

ICW issued a CGL policy to Strang on July 1, 1988. The 1988-1989 additional insured endorsement, a form 2010 endorsement, specifically identified Pardee as an additional insured for "HERITAGE IV, V and VI." The endorsement provided: "This endorsement modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE PART. SCHEDULE Name of Person or Organization: PARDEE CONSTRUCTION [address] [¶] WHO IS AN INSURED (Section II) is amended to include as an

---

[6]As to ICW and U.S. Fire, the trial court alternatively found that in the event the subcontracts and insurance policies contain any ambiguity, the reasonable and objective intent of the insurers and the insureds was not to provide coverage for the Heritage II project.

insured the person or organization shown in the Schedule [Pardee Construction], but only with respect to liability arising out of 'your [Strang's] work' for that insured by or for you."[7] Because the Heritage II project is comprised of the production units built as phases or units III and IV, the references to Heritage IV, V and VI described phases of development IV, V and VI of the Heritage project. The Association's complaint in the underlying action alleged the following defects in Strang's work: "The . . . sheet metal . . . [and the] . . . mechanical . . . systems . . . are defective, unsound, and are failing; they leak, and are staining, corroding, cracking, breaking down and deteriorating due to defective design, workmanship and materials, causing property damage[, and the] [¶] ventilation systems at the project are defective, have failed, and are failing, causing property damage."[8]

ICW also issued a CGL policy to Coast for the period April 21, 1992, through April 21, 1993. Although no additional insured endorsement naming Pardee was issued by ICW under the policy, Pardee did receive a certificate of insurance, dated May 13, 1992, naming it as an additional insured for "all operations and all jobs." The Association's complaint similarly alleged the stucco was failing and causing property damage. It specifically alleged that the ". . . waterproofing stucco . . . [is] defective, unsound, and [is] failing; [it] leak[s] and [is] staining, corroding, cracking, breaking down and deteriorating due to defective design, workmanship and materials causing property damage."[9]

Nationwide insured Coast and Doose. As to the Coast February 1, 1988-1989, and March 1, 1989-1990, CGL policies, Nationwide insured Pardee as an additional insured under form 2010 additional insured endorsements, similar to ICW's usage as to Strang, for liability arising out of Coast's work for Pardee. The endorsements did not restrict coverage to any particular project and the certificates of insurance referred to "[a]ll [o]perations." Under the December 31, 1990-1993, Doose policies, Nationwide issued form 4190 additional insured endorsements naming Pardee as an additional insured. The endorsements read: "WHO IS AN INSURED (Section II) is amended to include as an insured the Person or Organization in the Schedule, but this

[7]The 1989 ICW endorsement slightly differed, specifically providing for additional insured coverage as to liability arising out of Strang's sole negligence and resulting from its work for Pardee.

[8]Pardee's tender of its defense to ICW under the Strang policies on June 12 and July 3, 1996, based on the potential property damage arising from Strang's work on phases III and IV of the Heritage project was never responded to by ICW.

[9]Pardee's tender of its defense to ICW under the Coast policy on September 10, 1996, was denied on the basis ICW could not locate the endorsement naming Pardee as an additional insured.

insurance with respect to such Person or Organization applies only to the extent that such Person or Organization is held liable for your acts or omissions arising out of and in the course of operations performed for such Person or Organization by you or your subcontractor." The certificates of insurance further refer to "all operations." Neither Nationwide's policies, nor their endorsements, exclude "completed operations" of its named insureds as to either them or any additional insureds. The certificates for Coast include limits of coverage of $1 million for products-completed operations, while the certificates for Doose include limits of coverage of $2 million for products-completed operations.

The Association's complaint in the underlying action alleged defects regarding the work of both Coast and Doose that caused property damage. Specifically, as to Coast's work, the allegations in the complaint are summarized above. As to the work of Doose, the complaint alleged the ". . . electrical systems and other systems and components throughout the project are defective, unsound, and are failing; . . . causing property damage" and further that "[t]he plumbing, piping, and ventilation systems at the project are defective, have failed, and are failing, causing property damage."[10]

U.S. Fire insured Hazard under five successive CGL policies from May 8, 1992 through May 8, 1997. Pardee was named an additional insured under each policy by a form 2010 endorsement, as well as under a blanket endorsement providing coverage for Pardee "but only with respect to liability arising out of operations performed for [it] by or on behalf of the named insured." The policies also included a self-insured retention (SIR) for each year that U.S. Fire was on the risk, to wit $25,000 for the first year and $50,000 for each year of coverage thereafter. Again, the allegations in the complaint in the underlying action specifically listed defects and deficiencies in Hazard's work, including asphalt cracking, concrete swales sinking, water intrusion and pavement/swale interface and the lack of proper compaction of the asphalt and/or base and subgrade, that had caused damage to the components of the project.[11]

■ The unambiguous language of the policies and endorsements provides Pardee with coverage for the completed operations of the named

---

[10]Nationwide denied Pardee's tender under the Coast policies on the basis the certificates and endorsements naming Pardee as an additional insured were issued after completion of the Heritage II project and thus did not cover damages arising from the alleged construction defense. Similarly, Nationwide denied Pardee's tender under the Doose policies because the endorsements were not in effect at the time of construction and Doose was not insured with Nationwide until after construction of the project.

[11]Pardee's tender was denied by U.S. Fire.

insured subcontractors. It is undisputed that Pardee is an additional insured under the terms of the subject policies and that these policies do cover the named insured for completed operations. Indeed, at oral argument, counsel for ICW, Nationwide, and U.S. Fire acknowledged the policies provided the named insured subcontractors completed operations coverage for projects completed before inception of the policies. Moreover, it appears undisputed the Association's complaint in the underlying action raises the potential of covered property damage occurring during the respective policy periods. Rather, the sole issue for interpretation is whether the additional insured endorsements explicitly *exclude* coverage for the subcontractors' completed operations; for coverage limitations must be "conspicuous, plain and clear" in nature in order to be effective (*Feurzeig v. Insurance Co. of the West* (1997) 59 Cal.App.4th 1276, 1283 [69 Cal.Rptr.2d 629]).

The endorsements adding Pardee as an insured combined with the insuring clauses of the policies provide the general grant of coverage for completed projects or operations to Pardee. The form 2010 endorsements issued by ICW, Nationwide and U.S. Fire provide coverage limited only by the phrase, "liability arising out of 'your [the named insured's] work' for [the additional insured] by or for you." Given the products-completed operations hazard definition specifically utilizes the language "arising out of 'your product' or 'your work'" and that "your work" is defined as meaning "[w]ork or operations performed by you or on your behalf,"[12] it is apparent that completed operations as referred to in these policies was intended to be included in the type of liability referred to in the form 2010 endorsements. The insurers, including amicus curiae Golden Eagle Insurance Company, suggest the aforementioned clear language demonstrates an intent to cover Pardee for the subcontractor's work for only the Pardee project that subcontractor was about to work on when it obtained the insurance. To the contrary, there is no language in this pre-1993 form 2010 endorsement expressly limiting the time frame of the additional insured coverage to the time of the ongoing operations of the named insured. (Oonk, *The Construction Industry: Coverage Issue Created by Claims Against Additional Insureds* (Summer 1999) 28 Briefcase 8, 11.) Had the insurers wished to limit coverage to "work in progress," they could have easily done so by defining "your work" as work "now being performed or to be performed during the term of this policy." Indeed, "your work" is further defined in the policies as including warranties and representations. Liability arising out of such inherently involves completed work, not work in progress. Simply stated, the insurers

---

[12]The CGL coverage form provides that "products-completed operations hazard" includes property damage occurring away from premises you own or rent and arising out of "your product" or "your work." "Your work" is defined as "[w]ork or operations performed by you or on your behalf. . . ." It includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work' . . . ."

failed to expressly limit covered completed operations as to time or particular project in their policy and endorsement language.

Insurance commentators have concurred. For example, one commentator writes: "Until recently, standard additional insured endorsements of the kind ordinarily used by contractors to add project owners as additional insureds were worded so as to cover completed operations. The coverage provided by these endorsements applied to losses arising out of 'your [i.e., the contractor's] work,' and the CGL definition of 'your work' is broad enough to encompass work that has been completed and turned over to another party. ' "Your work" means work or operations performed by you or on your behalf . . . .' 'Performed by you' in this definition can reasonably be understood to mean '*being* performed by you' (i.e., work in progress) or '*that has been* performed by you'. . . (i.e., completed operations)." (Wielinski et al., Contractual Risk Transfer (Internat. Risk Management Inst. (IRMI) 1998) § XI.C, pp. 19-20.)

Amicus curiae Golden Eagle Insurance Company contends this issue of policy interpretation cannot be resolved simply by reading the policies without reference to the subcontracts or the parties' intent. It relies on policy language defining "your work" in the definition of "Completed Operations Liabilities" for its proposition the policies' terms direct the court to the construction subcontracts pursuant to which the additional insurance was obtained. Pertinently, the definition provides that "your work" will be deemed completed at the earliest of (1) when the work called for in your contract has been completed, or (2) when all the work to be done at the site has been completed if your contract calls for work at more than one site.[13] Golden Eagle thus extrapolates that the references to "your contract" refer to the subcontract which required the obtaining of additional insurance coverage in the first place, not contracts pertaining to work already completed before the policy issued. Golden Eagle misses the mark. That definition only defines when "your work" is deemed completed to qualify within that coverage part. It does not limit the coverage afforded to an insured named by endorsement, nor does it require consideration of the contract to interpret the coverage in the policies. Indeed, the insurers (and the trial court) mistakenly

---

[13]Precisely, the CGL coverage form provides: " 'Your work' will be deemed completed at the earliest of the following times: (1) When all of the work called for in your contract has been completed. (2) When all the work to be done at the site has been completed if your contract calls for work at more than one site. (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project. [¶] Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

focus on the terms of the subcontract. Neither the language of the endorsements nor that of the policies limits coverage to the work of the named insured subcontractor on a particular project or excludes completed operations.

Although Nationwide's form 4190 additional insured endorsement and U.S. Fire's blanket form endorsement contain slightly different language limiting coverage to liability "arising out of and in the course of operations performed" or simply "arising out of operations performed" by the named insured subcontractor, the interpretive result is the same. Granted, this language does not reference the phrase "your work"; however, it uses language that specifies past operations, i.e. "operations performed." Moreover, "operations performed by you" is the cornerstone of the definition of "your work." (See *ante*, fn. 12.) Consequently, by reasonable inference, the insurers' use of the cited phrase similarly manifests intent to cover both past and ongoing operations.

The insurers could have limited coverage by express policy language that coverage was limited to claims arising from work performed during the policy period. However, they did not. Indeed, they acknowledge they intended to provide the named insureds completed operations coverage for projects completed before inception of policies. Similarly, the insurers could have used the form 2009 additional endorsement, which has been widely employed since the mid-1980's to add a contractor as an additional insured under a subcontractor's policy and which clearly excludes "completed operations."[14] Again, they did not.

Moreover, in 1993, the Insurance Services Office (ISO)[15] revised the language of the form 2010 endorsement utilized by the insurance industry to

---

[14]The form 2009 additional insured endorsement provides: "This insurance does not apply to: [¶] . . . [¶] (2) 'Bodily injury' or 'property damage' occurring after: [¶] (a) All work on the project (other than service, maintenance, or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or [¶] (b) That portion of 'your work' out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project." (Turner, Insurance Coverage of Construction Disputes (Shepard's/McGraw-Hill, Inc., 1992) appen. I, p. 526.)

[15]"ISO is a nonprofit trade association that provides rating, statistical, and actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review. Most carriers use the basic ISO forms, at least as the starting point for their general liability policies. [Citations.]" (*Montrose II, supra*, 10 Cal.4th at p. 671, fn. 13.)

expressly restrict coverage for an additional insured to the "ongoing opera-
tions" of the named insured.[16] This revised language effectively precludes
application of the endorsement's coverage to completed operations losses.
(Wielinski et al., Contractual Risk Transfer, *supra*, § XI.C, p. 26.) One
insurance commentator stated regarding the 1993 revisions of the standard
additional insured endorsement forms: "The restriction of coverage in the
two endorsements to only ongoing operations makes it clear that additional
insureds will have no coverage under the named insured's policy for liability
arising out of the products-completed operations exposure. . . . The effect
of this change—restricting the coverage to ongoing operations—is, however,
much more profound on [form 2010]. Previous editions of [that form]
contained no completed operations exclusion and, thus, could be called on to
cover an additional insured for liability arising out of the products-com-
pleted operations hazard." (Malecki, The Additional Insured Book (IRMI 3d
ed. 1997) ch. 9, pp. 141-142.) Similarly, construction industry and under-
writing spokespersons have echoed this assessment: "Completed Operations
Coverage. Prior to the 1993 . . . revisions, the standard ISO additional
insured endorsements provided the additional insured with coverage for
liability arising out of 'your operations performed for' the additional insured,
which included completed operations. More recent editions of these endorse-
ments provide coverage only with respect to 'your ongoing operations,'
which effectively eliminates coverage for completed operations." (Construc-
tion Risk Management (IRMI 1999) § VI, p. VI.C.25.) Although these 1993
revisions postdated the insurers' policies here with the exception of U.S.
Fire, they evince as to Nationwide and ICW alternative express limiting
language that could have been employed.

Consequently, the insurers' failure to use available language expressly
excluding completed operations coverage implies a manifested intent not to
do so. Insurers have never been prohibited from issuing, and commonly have
issued, additional insured endorsements that specifically limit coverage to
situations in which the additional insured is faced with vicarious liability for

---

[16]"When the ISO commercial general liability program was extensively revised in 1993, a
number of additional insured endorsements were reworded to eliminate coverage of the
completed operations hazard. Coverage under the revised endorsements applies, not to
liability arising out of 'your work,' but to liability in connection with 'your ongoing
operations'—in other words, work in progress only. When the named insured's operations for
the additional insured are no longer 'ongoing,' the additional insured no longer has coverage,
regardless of how long the endorsement is maintained as part of the policy. ISO explained this
change in its additional insured endorsements by stating that it was never the intention of
insurers to provide additional insureds with completed operations coverage, and that use of
the term 'your work' inadvertently broadened the scope of additional insured coverage
beyond its intended limits." (Wielinski et al., Contractual Risk Transfer, supra, § XI.C, p. 20.)

negligent conduct by the named insured. (See, e.g., *Mountain Fuel Supply Co. v. Reliance Ins. Co.* (10th Cir. 1991) 933 F.2d 882, 887, fn. 7 [completed operations clause in endorsement provided that coverage for additional insured ended once the named insured completed work on the covered project].) By analogy, we agree with the court in *Acceptance Ins. Co. v. Syufy Enterprises*, *supra*, 69 Cal.App.4th at pages 330-331, that when an insurer elects not to use clearly limiting language in an additional insured clause, but rather grants coverage for liability arising out of the named insured's work, the additional insured is covered under the circumstances here without regard to whether the work is still in progress. " 'If the parties had intended coverage to be limited to the [extent] suggested by the defendants [the insurers], language clearly embodying that intention was available . . . . ' " (*Id.* at p. 331, quoting *Philadelphia Elec. Co. v. Nationwide Mut. Ins. Co.* (E.D.Pa. 1989) 721 F.Supp. 740, 742.)

Because we conclude the clear and unambiguous language of the policies and endorsements provide Pardee with coverage here, it is unnecessary and improper for us to consider the extrinsic evidence proffered by the insurers. Simply stated, the clear and explicit language of the policies and endorsements govern. Coverage limitations as to an additional insured are not implied from a broad grant of coverage for completed operations to a named insured unlimited by time or project. The underlying subcontract may well explain why the subcontractor obtained CGL insurance naming Pardee as an additional insured in the first place, but it is not probative of the parties' mutual intent manifested in the policy and endorsement language they finally agreed upon. ■ Moreover, a party's subjective intent cannot be used to create an ambiguity in otherwise clear and explicit language, as evidence of undisclosed subjective intent as to policy coverage is irrelevant to determining the meaning of contractual language. (*Havstad v. Fidelity National Title Ins. Co.* (1997) 58 Cal.App.4th 654, 661 [68 Cal.Rptr.2d 487].)

However, in reaching our decision, we are not unaware of the commercial context from which this controversy arose. The insurers would have us believe a general contractor would seek additional insured coverage from its subcontractors solely in the event that there is a course of construction work site accident involving bodily injury or property damage. Thus, they assert the insurer would not intend to provide coverage to the additional insured general contractor after the named insured subcontractor's work for that developer had been completed. This myopic spin ignores commercial reality. Damage resulting from a subcontractor's work often does not arise for years. It is thus prudent for general contractors to obtain completed operations

coverage as additional insureds from their subcontractors' insurers. Why would Pardee have required its subcontractors to maintain CGL coverage that included completed operations coverage and to name it as an additional insured on those policies unless it expected to be covered for the same completed operations as its subcontractors? Certainly that expectation is reasonable given that the additional insured coverage is intended by the insurance industry to cover vicarious liability that an additional insured may incur due to operations of the originally named insured. Nor is there any dispute the endorsements were purchased so as to protect the general contractor against potential construction defect litigation. Mindful such litigation is typically complex and expensive, it is reasonable to conclude the key motivation in procuring an additional insured endorsement is to offset the cost of defending lawsuits where a general contractor's liability is claimed to be derivative. (See *Maryland Casualty Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 33 [76 Cal.Rptr.2d 113].) Rather, commercial reality here is that all parties fully understood the others' intentions; but, one party, the insurer, failed to draft and incorporate express coverage limitations in its policy and endorsement language.[17]

## III, IV*

. . . . . . . . . . . . . . . . . . .

## V

■■■■ THE JUDGMENTS ON THE PLEADINGS[25]

Relying on the trial court's rulings regarding the duty to defend, each insurer moved for judgment on the pleadings. They argued the trial court's

---

[17]As to U.S. Fire, the trial court assumed for purposes of ruling on the summary judgment motions that Pardee had satisfied the SIR requirement in the U.S. Fire policies. Pardee argues the assumption was unnecessary, because it was never informed of the SIR requirement as to one policy; it constitutes a question of fact as to who must satisfy the SIR condition; and, even if Pardee were required to satisfy the SIR, it did so. Although this court exercises de novo review of a summary judgment (examining the facts and independently determining their effect as a matter of law) and may affirm it on a basis not relied upon by the trial court (*Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376 [63 Cal.Rptr.2d 522]), we defer to the trial court to rule on this issue in the first instance.

*See footnote 1, *ante*, page 1340.

[25]"A motion for judgment on the pleadings is tantamount to a general demurrer. . . . On appeal from the granting of the motion, the standard of review is the same as for a judgment of dismissal following the sustaining of a general demurrer. [Citations.]" (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 764 [62 Cal.Rptr.2d 778].) Thus, we apply the de novo standard of review, exercising our independent judgment in determining whether the pleadings, together with matters that may be judicially noticed, entitle the insurers to judgment. (*Schabarum v. California Legislature* (1998) 60

ruling of no defense obligation required the dismissal of all of Pardee's remaining causes of action for breach of contract, breach of the duty of good faith and fair dealing, fraud and declaratory relief as to the duty to indemnify. The trial court agreed and granted the motions for judgment on the pleadings.

Because we conclude the trial court erred in concluding ICW, Nationwide and U.S. Fire did not owe Pardee a duty to defend, the judgments on the pleadings for those insurers must be set aside. However, as to Liberty, the trial court correctly granted Liberty's motion for judgment on the pleadings based on its correct conclusion Liberty owed Pardee no duty to defend under the circumstances. Absent a duty to defend, there can be no breach of the insurance contract for failing to defend (*Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1496 [66 Cal.Rptr.2d 714]); no breach of the implied covenant of good faith and fair dealing here (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 36; *Rosen v. Nations Title Ins. Co., supra*, 56 Cal.App.4th at p. 1496; *Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 514 [46 Cal.Rptr.2d 845]); no fraud based solely upon the alleged misrepresentations contained in the written additional insured endorsements; and no duty to indemnify.

### DISPOSITION

The judgments are reversed in their entirety as to ICW, Nationwide and U.S. Fire, with directions that the trial court enter orders granting Pardee's motions for summary adjudication as to the duty to defend as to ICW and Nationwide. With regard to U.S. Fire, on remand the trial court is directed to address whether Pardee was contractually required to comply with a SIR condition and, if so, whether it satisfied any SIR obligation, an issue presented but not addressed in U.S. Fire's motion for summary adjudication. The judgment on behalf of Liberty is affirmed. Pardee is entitled to costs from ICW, Nationwide and U.S. Fire. Liberty is entitled to costs from Pardee.

Kremer, P. J., and McIntyre, J., concurred.

Petitions for a rehearing were denied February 23, 2000, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied April 26, 2000. Werdegar, J., and Chin, J., were of the opinion that the petition should be granted.

Cal.App.4th 1205, 1216 [70 Cal.Rptr.2d 745]; see *Smiley v. Citibank* (1995) 11 Cal.4th 138, 145-146 [44 Cal.Rptr.2d 441, 900 P.2d 690].)