Filed 8/30/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PULTE HOME CORPORATION, | D070478 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 2013-00050682-CU-IC-CTL) |
| AMERICAN SAFETY INDEMNITY COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L.

Styn, Judge.  Affirmed in part and reversed in part with directions.

Wilson, Elser, Moskowitz, Edelman & Dicker, Gregory D. Hagen; Greines,

Martin, Stein & Richland, Robert A. Olson and Gary J. Wax, for Defendant and

Appellant.

Koeller, Nebeker, Carlson & Haluck, Robert C. Carlson, Sharon A. Huerta and

Sarah P. Long, for Plaintiff and Respondent.

In this insurance defense dispute, defendant and appellant American Safety

Indemnity Company (American Safety or ASIC) challenges a judgment after court trial

that awarded over $1.4 million in compensatory and punitive damages to plaintiff and

respondent Pulte Home Corporation (Pulte), who was the general contractor and developer of two residential projects in the San Marcos area. American Safety issued several sequential comprehensive general liability (CGL) insurance policies to three of Pulte's subcontractors,[1] and during 2003 to 2006, it added endorsements to those policies that named Pulte as an additional insured. The projects were completed by 2006.

In 2011 and 2013, two groups of residents of the developments sued Pulte for damages in separate construction defect lawsuits. After American Safety declined to provide Pulte with a defense, Pulte filed this action, asserting that the additional insured endorsements afforded it coverage and therefore required American Safety to provide it with defenses on the construction defect issues. The trial court resolved companion summary judgment and adjudication motions by ruling as a matter of law that a duty to defend was owed under at least one of the policies. (Code Civ. Proc.,[2] § 437c.) In bifurcated proceedings, the court proceeded to hear testimony to determine that contract damages were owed on each policy for the failure to carry out the duty to defend. (§ 592 [issues of law resolved before issues of fact].) The court also ruled that American Safety had breached its implied covenant duties through its bad faith conduct in claims handling that denied a defense.

---

[1]    Subcontractors on the projects who carried American Safety's insurance and who obtained additional insured endorsements for Pulte included Concrete Concepts, Inc. (Concrete), Frontier Concrete, Inc. (Frontier) and Foshay Electric Co., Inc. (Foshay). Where appropriate, we refer to these named insured "subcontractors" as a group, as it is not disputed that their policies had substantially similar endorsement language, as relevant here.

[2]    All further statutory references are to the Code of Civil Procedure unless noted.

During the next phase of trial, the court awarded Pulte punitive damages and attorney fees under *Brandt v. Superior Court* (1985) 37 Cal.3d 813 (*Brandt*) [attorney fees recoverable as compensatory damages, attributable to counsel's efforts in obtaining rejected amounts due under insurance contract]; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 807 [applying *Brandt* in context of contingency fee agreement].)

To address American Safety's challenges to the judgment, we first interpret the coverage provisions of the subject policies in light of the teachings of *Pardee Construction Co. v. Insurance Co. of the West* (2000) 77 Cal.App.4th 1340, 1356 (*Pardee*). In that case, this court addressed the scope of coverage that may be afforded by additional insured endorsements in the factual context of construction defect litigation. We conclude that the trial court was correct in ruling that the language of American Safety's additional insured endorsements on the underlying insurance policies created ambiguities on the potential for coverage in the construction defect lawsuits, thus requiring it to provide Pulte with a defense to them. The trial court's subsequent decision that American Safety's failure to do so was unreasonable and in bad faith is supported by substantial evidence. We additionally uphold the court's decision that Pulte is entitled to an award of punitive damages that is proportional, on a one-to-one basis, to the award of compensatory damages in tort. (*Bullock v. Philip Morris USA Inc.* (2008) 159 Cal.App.4th 655, 690, fn. 18.)

Although we affirm the judgment as to its substantive rulings, as above, we are required to reverse it in part as to the award of $471,313.52 attorney fees under *Brandt, supra,* 37 Cal.3d 813, which we find to be inconsistent with the damages principles and

3

policies set forth in *Brandt*. We believe the court abused its discretion in implementing an hourly attorney fee arrangement that Pulte did not arrive at until after trial, to replace the previous contingency fee agreement in a manner that Pulte intended would operate to increase its demand.[3] Second, since the court calculated its $500,000 award of punitive damages by appropriately utilizing a one-to-one ratio to the compensatory damages under *Brandt* (fees in the amount of $471,313.52), it is necessary to direct the trial court to recalculate not only the fees award under *Brandt* but also to adjust the amount of punitive damages accordingly. The judgment will be reversed to that extent, with directions to award *Brandt* fees only at a level consistent with Pulte's originally effective contingency fee agreement, and then to impose an amount of punitive damages that reflects the basic one-to-one proportion previously ordered. The balance of the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Underlying Lawsuits and Tenders*

Beginning in 2003, Pulte was the general contractor and developer for two single-family residential housing projects, Meridian and Mariners' Landing (the projects), and it began to sell the homes in 2005 and 2006. During construction of both projects, Pulte entered into subcontracts with Concrete and Frontier to supply concrete foundations and flatwork. Pulte also entered into subcontracts with Foshay to supply electrical and related

---

[3] In contrast to the award of *Brandt* fees, the court based its contract damages award on the hourly billings and invoices submitted, along with a finding that the expert testimony supported the conclusion that the amount billed was reasonable based on analysis of such material. Accordingly, there is no apparent issue on appeal arising as to the change in fee agreements, except as to *Brandt*.

4

waterproofing work for both projects. All the subcontracts required that the subcontractors maintain liability insurance and that they name Pulte as an additional insured on their insurance policies.

In 2011, a group of Meridian homeowners filed a construction defect lawsuit against Pulte. (*Schaefer v. Pulte Home Corporation* (Super Ct. San Diego County, 2011, No. 37-2011-00086211-CU-CD-CTL) (the *Schaefer* action).) This lawsuit contained allegations against Pulte that its homes, sold after 2005 and 2006, were defectively constructed in their foundation systems and slabs, thus allowing moisture to enter into the structure and limiting the type of flooring materials and installation available. Such allegations, and those of other water intrusion and cracks in the walls and ceilings, potentially implicated the concrete subcontractors' work on the Meridian project. Pursuant to Concrete's and Frontier's policies and endorsements, Pulte tendered its defense of the lawsuit to American Safety. It provided copies of the subcontracts, insurance certificates and/or endorsements, and the construction defect complaint, with a homeowner matrix. American Safety refused for numerous reasons.

In 2013, a group of homeowners in Meridian and in Mariners' Landing filed their construction defect lawsuit against Pulte. (*Large v. Pulte Home Corporation* (Super. Ct. San Diego County, 2013, No. 37-2013-00043457-CU-CD-CTL) (the *Large* action).) This lawsuit contained water intrusion and other claims against Pulte potentially implicating the concrete subcontractors' work at the sites. Allegations were made that Foshay's electrical and related waterproofing work on the two projects was substandard and had contributed to damage at the projects, for which Pulte should be vicariously

5

responsible.  Pursuant to all three policies and with supporting documentation, Pulte tendered its defense of the lawsuit to American Safety, which declined.  Numerous reasons were given.

Both construction defect actions went forward.  Another carrier that is not a part of this lawsuit, Interstate, provided a partial defense to Pulte.

*B.  The Insurance Policies*

During the time frames 2003 through 2006, American Safety issued to each of the three subcontractors, as "Named Insureds," several liability insurance policies for successive one-year periods.  Each policy's insuring agreement provided coverage for property damage (or bodily injury, not involved here) to which the insurance applied, caused by an occurrence, during the policy periods.

The declarations page of each of the policies states that the aggregate limit for "products – completed operations" was $1 million.  The insuring agreement and the definitions portions of the policies set forth terminology that is relevant here.  The definitions of "products – completed operations hazard," include all property damage occurring away from the insured's premises, "arising out of 'your product' or 'your work' " (except for incomplete work or abandoned work; not involved here).  " 'Your work' " is defined as meaning "(a) [w]ork or operations performed by you or on your behalf, and (b) [m]aterials, parts or equipment furnished in connection with such work or operations." " 'Your work' " includes warranties as to fitness and quality.

6

Within the "products – completed operations" definitions, "your work" is deemed complete either when the work (a) called for in the contract is complete; (b) at a particular job site is complete; or (c) is put to its intended use.

Under the policy, "occurrence" means an accident, "including continuous or repeated exposure to substantially the same general harmful conditions."  "Property damage" includes:  "a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it."

With respect to what entities constitute "the insured" under the subcontractors' policies, American Safety issued additional insured endorsements (AIEs) to Pulte, to become effective upon policy issuance (or later, when work first started, etc.).  Both appellant and respondent in this case agree that while the exact language of the various AIEs in the various policies varies slightly, they are all substantially similar.  A key version of the grant of coverage in the AIEs states:

> "WHO IS AN INSURED (SECTION II) is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of 'your work' which is ongoing and which is performed by the Named Insured for the Additional Insured on or after the effective date of this Endorsement."

An alternative version of the AIE amended the definition of "who is an insured" to include Pulte as an additional insured, "but only with respect to liability arising out of 'your work' *and* only as respects ongoing operations performed by the Named Insured for

7

the Additional Insured on or after" the endorsement's effective date. (Italics added.)

Some of the policies replace the italicized "*and*" (as above) with "*but*."

In two of the Foshay versions (all three of which were applicable only to the *Large* project, not *Schaefer*), the AIEs are stated to provide coverage to the additional insured, "but only with respect to liability arising out of 'your work' which is performed *at the project designated above*. This Endorsement applies only to ongoing operations performed by the Named Insured on or after" the endorsement's effective date. (Italics added.) These Foshay policies specify "*at the project designated above*," because they include a line in the endorsement for the "Name of Project," which identifies, "Those projects on file with the Company."[4]

Each of the subcontractors' policies includes numerous exclusions in sections designated by that heading. As relevant here, American Safety relies on separate "faulty workmanship" or "work product" exclusions. In exclusion j.(5), the subcontractors' policies state that no coverage is afforded for "property damage" to "[t]hat particular part of real property on which you . . . are performing operations, if the 'property damage' arises out of those operations[.]" Likewise, exclusion j.(6) precludes coverage for "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." This exclusion j.(6) "does not apply to 'property

---

[4]     Although the Foshay policies are the only ones here that include a restriction that the policy covers only "projects on file with the company," some of the Concrete and Frontier denial letters from American Safety also use that policy language for a basis for denial (i.e., referring to failures to file the project with the company).

damage' included in the 'products-completed operations hazard.' " American Safety also discusses exclusion (l), "Damage to Your Work," as excluding coverage for "property damage" to the insured's work "arising out of it or any part of it and included in the 'products-completed operations hazard.' "[5]

### C. *This Action Filed; Series of Summary Judgment Motions*

Pulte filed this action in 2013 seeking damages, including awards of unreimbursed defense expenses, *Brandt* fees and punitive damages. Declaratory relief was requested on the duty to defend and/or indemnify, breach of contract damages for the failure to defend and/or indemnify, and further relief for breach of the duty of fair dealing and good faith. As bad faith, Pulte alleges American Safety (1) failed to conduct "a reasonable, timely, and unbiased investigation" to fully evaluate the requests for a full defense; (2) failed to respond in a timely manner; (3) refused to honor its obligations under the policies; (4) misrepresented pertinent policy provisions; (5) based the coverage decisions "on a desire to reduce and/or avoid obligations to Pulte," thus refusing to afford it a defense. This conduct allegedly "purposely deprived Pulte of the rights and benefits as an insured under the policies." Moreover, it was alleged to be part of a "conscious and deliberate pattern of unfair claims practices" of nonpayment and rejection of tenders of defense and

---

[5] The policies contain numerous other restrictions that were litigated at trial, but that are not actively pursued as operative in this appeal. These include provisions in an endorsement for a self-insured retention (SIR), and a "sole negligence" requirement. As noted, Pulte received a partial defense from another carrier, Interstate, that is not a part of this lawsuit. We are not required to address the disputes during trial about the applicability of such other insurance, except to a limited extent regarding bad faith, as will be explained (pt. III, *post*).

indemnity made by the insureds, thus serving to frustrate Pulte's and other additional insureds' reasonable expectations for coverage under the terms of the liability insurance policies.

Pulte's initial motion for summary adjudication as to a declaration of the duty to defend was denied, and this court denied its petition for a writ of mandate vacating that ruling. (*Pulte Home Corporation v. Superior Court*, Dec. 16, 1984, D067083.)

Later in the action, Pulte and American Safety filed cross-summary judgment/summary adjudication motions. According to Pulte, it was entitled to summary adjudication and declaratory relief that American Safety had a duty to defend both underlying actions, under the Concrete policies.

In contrast, American Safety sought summary judgment that (1) it owed no duty to defend as to any of the subcontractors' policies, and (2) as a matter of law, its position that there was no duty to defend and no coverage potential was reasonable, for purposes of the bad faith claim.

By June 2015, the trial court issued rulings on both the motions. It granted Pulte's summary adjudication request to find that American Safety had a duty to defend Concrete in the actions. The court determined that American Safety had not established triable issues of material fact on several defenses it was raising, such as a lack of evidence about when work was performed at the defective homes. The court determined that as of the time of tender, American Safety was potentially exposed to liability on Concrete's policies for work performed on the homes on or after the effective date of the AIEs. The court found no triable issues had been raised by American Safety that the work product

10

(faulty workmanship) exclusions might have applied. In reading the language of the policy, the court further determined that the subcontractors' policies provided coverage for completed operations and the AIEs had not excluded such coverage. After Pulte's motion was granted, American Safety did not take up the defense of the still-pending *Large* litigation.

Next, the court denied American Safety's motion for summary judgment or summary adjudication. As previously noted (fn. 5, *ante*), two issues that were dealt with are no longer pursued on appeal, a sole negligence restriction and a SIR requirement.[6] However, the court issued key rulings denying summary judgment to American Safety based on the ongoing operations language in its policies. The court analyzed the authority of *Pardee, supra*, 77 Cal.App.4th at pages 1356 through 1357, on the related topic of completed operations coverage as arising out of this property damage AIE language, "liability arising out of 'your work.' " The court found that the AIEs' references to ongoing operations had not expressly excluded complete operations coverage, and there were triable issues of fact on a potential for such coverage that would preclude a summary judgment for American Safety. The court also addressed a policy term found only in Foshay's policies, that covered projects had to be "on file" with the company. The court determined that there were triable issues of material fact as to whether those

---

[6] In ruling against American Safety's request for summary judgment, the court noted that in the present duty to defend context, there was no appropriate reliance on "the genuine dispute doctrine," which precludes bad faith findings where an insurance carrier has a reasonable basis to deny coverage. Even if the doctrine did apply, the trial court said it would not operate in American Safety's favor on the motion.

projects were known to be on file with American Safety, within the meaning of the policy.

### D.  *Phase 1 of Court Trial:  Rulings on Duty to Defend and Bad Faith*

At trial beginning in November 2015, Pulte submitted a motion under section 592 to have certain rulings of law made before factual issues were tried.  Pulte referenced the court's ruling that had granted its previous summary adjudication motion to establish as a matter of law that under the Concrete policies, American Safety had a duty to defend Pulte in the still ongoing *Large* matter, and likewise had such a duty in the *Schaefer* case (since resolved).  Pulte argued that since the other subcontractors, Foshay and Frontier, were also insured by American Safety while they worked on the same homes involved in these underlying actions, during the same time frames, a similar ruling should be issued as to those subcontractors.  Pulte reasoned, "Because all factual predicates to the duty to defend as to Foshay and Frontier were admitted by American Safety in its denial letters, and all legal issues have been resolved by the Court's prior ruling in Pulte's favor, the Court should now rule as a matter of law that American Safety owed Pulte a duty to defend under the Foshay and Frontier policies as well."

This motion was opposed by American Safety on several grounds, arguing that some of the material being relied on by Pulte, purported statements of claims adjusters, was insufficient because it amounted to rephrasing hearsay information provided by Pulte in tendering the defense under the policies.  American Safety argued that even though Pulte had prevailed on its own motion, it still had to prove there were "ongoing operations of the named insureds" during the effective dates of the endorsements, and it

12

was not enough to submit subcontracts and homeowner matrixes from the underlying actions.

As explained in the court's written decision after trial, the procedure it had followed was to hear Pulte's motion under section 592 (duty to defend under the Foshay and Frontier policies), but to defer decision on it until the end of trial. The court took testimony from Pulte's managing employees about the claims process, and from its construction defects counsel Sharon Huerta. Huerta testified that in such cases, additional defects lists were sometimes supplied after the initial complaints were filed by homeowners and investigations were conducted. Pulte's expert witness, Andrew Waxler, addressed coverage issues and the amounts of fees Pulte incurred to defend the underlying actions, saying they were reasonable in amounts. Although Pulte used a third party claims administrator for litigation and financial management, it paid for its own defense.

Pulte conducted direct examination of adverse witnesses, three of American Safety's claims examiners and their supervisor, corporate claims counsel Jean Fisher. (Evid. Code, § 776.) Fisher explained she began working for American Safety in 2005, until in 2006 she began working for the related American Safety Claims Services, its third party claims administrator. She assisted in drafting the subject AIEs. Although she testified that she did not make decisions directly for American Safety, she also admitted that she did not have to consult with its management in supervising her claims adjusters, who issued denial letters under her guidance.

As defense witnesses, American Safety presented further testimony from Attorney Fisher and expert testimony on policy interpretation from insurance expert Julia Molander.

At the close of testimony, the court addressed the reserved issues under section 592, noting that extensive proceedings had taken place to determine the effect of the previous summary adjudication ruling that there had been a duty to defend Concrete. The court was being asked to extend that duty to the other subcontractors, and also to decide whether the noncoverage position taken by American Safety had been reasonable or instead, tortious and in bad faith. The court ruled as a matter of law that, consistent with its previous rulings on summary judgment, American Safety had a duty to defend Pulte under each of the policies. The court reached this conclusion about the effect of the previous summary judgment rulings under the authority of *Montrose Chemical Company v. Superior Court* (1993) 6 Cal.4th 287, 300-301 (*Montrose I*) (discussing procedural ramifications of summary judgment rulings in duty to defend actions), and *McMillin Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 541 (*McMillin*) ["using an in limine motion as a substitute for a potentially dispositive statutory (e.g., summary judgment) motion produces substantial risk of prejudicial error"]; see pt. III.A, *post*).

Based on the court's independent reading of the policy language in light of the analysis in *Pardee, supra*, 77 Cal.App.4th 1340, it confirmed that these AIEs did not effectively exclude coverage for "completed operations" or for ongoing operations. Because American Safety was found to have owed a duty to defend Pulte under each

14

policy, the court outlined as the remaining issues whether Pulte had suffered any damages from that conduct and, if so, how much, regarding its claims on breach of the insurance agreements, for the expenses of defending the underlying *Schaefer* and *Large* actions. The court received extensive briefing, attorney declarations and invoices as to the fees Pulte had incurred and the recent change it had agreed to, from a contingency attorney fee arrangement to an hourly one.

In reaching its conclusions on breach of insurance duties and damages, the court noted it had years of experience with construction defect cases. The court made the observation that "construction defect litigation is notoriously fluid. Claims omitted from one defect list pop up on a later defect list. While American Safety is not required to speculate on future claims, the [inspection] reports do not establish there was no potential for coverage after their preparation." In evaluating American Safety's refusal to provide a defense, the court commented that the types of defects being alleged by the homeowners in the underlying cases gave rise to a potential for coverage.

Based on expert testimony, the court made a finding that the fees Pulte had incurred in defending the *Schaefer* and *Large* actions were reasonable. After making appropriate credits for fees Pulte had received from the other insurer (Interstate), the court made reductions for "(1) the $25,000 SIR [Schaefer], (2) fees incurred pre-tender, and (3) all fees for tendering to American Safety which, if awarded, would be part of the

15

*Brandt* fees." Ultimately, the adjusted and corrected contract damages, with prejudgment interest, totaled $455,238.45.[7]

The court next addressed whether the denials of defenses had been made in bad faith, so as to entitle Pulte to *Brandt* fees and, if so, the amount awardable. It concluded that American Safety's claims handling and denials of defenses had been conducted in bad faith, in breach of its duty of good faith and fair dealing owed to Pulte. American Safety had interpreted the only available case law by disregarding California federal courts' unpublished cases that were contrary to its noncoverage position. The court relied on several instances of conduct by American Safety representatives as constituting bad faith. However, it determined that the continuing refusal to defend Pulte, after the court issued its summary judgment rulings, was not per se unreasonable, in light of its knowledge and belief that another carrier, Interstate, was providing Pulte some form of defense in the underlying cases.[8]

The court then reached the issue of the substantive entitlement to punitive damages, in terms of whether Pulte had established by clear and convincing evidence that

---

[7] Although American Safety continues on appeal to challenge any imposition of liability, it evidently does not find fault with the trial court's arithmetic in reaching the contract damages calculations.

[8] Pulte argues in its respondent's brief that the trial court erred in ruling that American Safety's failure to defend Pulte in the *Large* action, after Pulte's summary adjudication motion was granted, did not amount to bad faith (since Interstate was providing an alternative defense to Pulte). (See, e.g., *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 70 [duty to defend evaluated without reference to another carrier's participation].) This factor has been considered as part of the overall picture but is not dispositive here.

16

American Safety was guilty of oppression, fraud or malice. The court found Pulte had made an adequate showing of American Safety's demonstrated pattern and practice of issuing AIEs, then using every conceivable argument to deny coverage, regardless of the merit of the arguments. The evidence showed this conduct had occurred not only in the current case but also in hundreds of denials of other additional insureds' tenders, amounting to misrepresentations about the policy provisions. The court determined that the testimony of Attorney Fisher and the claims adjusters demonstrated that Fisher had exercised substantial independent authority and judgment in claims handling, thus effectively determining corporate policy with the knowledge and cooperation of her managers, who ratified her decisions. All that conduct occurred in the context of American Safety's knowledge that both the named insureds and additional insureds intended that they would be receiving a defense if they were sued in construction defect cases. This conduct amounted to clear and convincing evidence of its malice and oppression.

The court accordingly required American Safety to produce evidence about its financial condition, in connection with the punitive damages requests. A second phase of trial on punitive damages and *Brandt* fees was required.

### E. Phase Two of Trial: Punitive Damages and Attorney Fees

Pulte submitted declarations dated February 9, 2016, after trial, from its house counsel Michael Laramie and its third party claims administrator, John Macy, about why Pulte had changed its contingency fee agreement to an hourly one, believing that more compensation for counsel was needed in response to the hard fought nature of the trial.

17

Following further briefing and oral argument, the court issued a separate decision on punitive damages and all of the attorney fees issues. In the discussion portion of this opinion, we will set forth its specific reasoning and awards. Pulte's base award of defense fees and costs, plus prejudgment interest, for the defense of the *Schaefer* and *Large* actions amounted to $455,238.45. In addition, it received a separate award of attorney fees and costs pursuant to *Brandt*, *supra*, 37 Cal.3d 813, in an amount intended to be equivalent to what Pulte had actually incurred and paid, subject to reductions by the court for ineligible fees (those incurred pre-tender, those incurred in pursuit of a defense, and the applicable self-insured retention amount). Pulte was thus awarded its unreimbursed defense fees and costs incurred, as *Brandt* attorney fees of $471,313.52, together with associated costs of $38,587. The court determined that punitive damages should be awarded against American Safety, on a one-to-one ratio to the *Brandt* fees, as appropriate for this type of case.

In total, the judgment entered against American Safety was for $1,478,288.37, with interest.[9] Its new trial motion on excessive damages grounds was denied and it appeals.[10]

---

[9]    The breakdown of the judgment is as follows: *Schaefer* defense fees and costs, $217,280.01; *Large* defense fees and costs, $114,842.98; *Schaefer* prejudgment interest to February 19, 2016, $101,353.79; *Large* prejudgment interest to February 19, 2016, $21,761.67; *Brandt* fees, $471,313.52; *Brandt* costs, $38,587; punitive damages, $500,000.

[10]    On June 5, 2017, this Court denied Pulte's request for judicial notice on appeal of an unpublished case report and of various trial court orders that were issued in unrelated cases in which American Safety was also a party. (Evid. Code, §§ 452, 453, 459.)

DISCUSSION

Here, as in *Pardee*, *supra*, 77 Cal.App.4th at page 1356, the initial issue for policy interpretation "is whether the additional insured endorsements explicitly *exclude* coverage for the subcontractors' completed operations." American Safety chiefly contends that its coverage exposure was limited to the time frame of the subcontractors' ongoing operations at the project sites, and that since the homes were sold as completed units, such ongoing operations had long been concluded. It also argues the faulty workmanship policy exclusions applied, in connection with its position that its noncoverage determinations were reasonable and not in bad faith.

In response, Pulte claims that as an additional insured, the tenders of defense that it provided to American Safety contained sufficient information to demonstrate its entitlement to a defense, based on potential completed operations coverage that should have been available under the policies. Pulte argues this grant of coverage "for liability arising out of 'your work' " was not inconsistent with the "ongoing operations" language. To address these issues and whether there is support in the record for the different forms of relief awarded by the trial court, we first outline policy interpretation standards in this factual context. (*Griffin Dewatering Corp. v. Northern Ins. Co. of New York* (2009) 176 Cal.App.4th 172, 208 (*Griffin Dewatering Corp.*) [reasonableness of insurer's contractual position depends on both the factual context in which the dispute arose and the rules of contract interpretation].)

19

I

*POLICY INTERPRETATION*

A.  Duty to Defend

Both parties agree that the trial court's basic policy interpretation rulings are subject to de novo review.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*); *Pardee*, *supra*, 77 Cal.App.4th at  p. 1349, fn. 3.)  "The determination whether an insurer owes a duty to defend is made in the first instance by comparing the terms of the policy with the allegations of the complaint.  Facts extrinsic to the complaint give rise to a duty to defend when they reveal the possibility the claim may be covered by the policy.  Conversely, where such facts eliminate the potential for coverage, the insurer may decline to defend even where the bare allegations of the complaint suggest potential liability.  This is so because the duty to defend, although broad, is not unlimited, but rather measured by the nature and kinds of risks covered by the policy.  An insurer may have a duty to defend even though it ultimately may have no obligation to indemnify . . . .  Finally, the duty to defend is a continuing one, arising upon tender and lasting until the underlying litigation is resolved, or until the insurer has established there is no potential for coverage."  (*Id*. at  p. 1350.)

"The fundamental rules governing the interpretation of contracts apply equally to the construing of insurance contracts.  They are premised on the primary goal of giving effect to the mutual intention of the parties at the time the contract is formed.  That intent is to be inferred, if possible, solely from the written provisions of the contract.  If the language of the insurance contract is clear and explicit, it governs.  [¶] . . . [¶] . . . [B]ut in

20

order to protect the objectively reasonable expectations of the insured, the courts endeavor to interpret the ambiguous language in the sense in which the insurer believed, at the time of making it, the insured understood it. Only if this approach does not resolve the ambiguity, do the courts then resolve it against the insurer." (*Pardee*, *supra*, 77 Cal.App.4th at p. 1352; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264-1265.)

"Since construction defect litigation is typically complex and expensive, a key motivation in procuring an additional insured endorsement is to offset the cost of defending lawsuits where the general contractor's liability is claimed to be derivative." (*Maryland Casualty Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 33.) " 'Endorsements on an insurance policy form a part of the insurance contract [citation], and the policy of insurance with the endorsements and riders thereon must be construed together as a whole [citation].' " (*Narver v. California State Life Ins. Co.* (1930) 211 Cal. 176, 181.)

### B. Potential for Coverage Regarding Additional Insureds

The subcontractors' base agreement with Pulte required them to "add Pulte []as an Additional Insured on the above general liability policy by having the insurance carrier issue a CGL-2010 Endorsement, Additional Insured-Endorsement Edition date 10/93, or its equivalent as determined by Pulte. This endorsement shall apply to the full extent of the actual limits of Contractors' coverage . . . ."

As to any AIE, "in resolving whether the allegations in a complaint give rise to coverage under a CGL policy, we must consider the occurrence language in the policy, as

21

well as the endorsements, if any, that broaden coverage included in the policy terms."

(*Pardee*, *supra*, 77 Cal.App.4th at p. 1351.) *Pardee* contains extensive analysis of the

different versions of AIEs used in the industry, as drafted by the ISO (e.g., a sample AIE,

the "2010" form; see Cal. Practice Guide: Insurance Litigation (The Rutter Group 2016)

¶ 7:1407.5, pp. 7E-3 to 7E-4.) Construction defect claims may arise long after

completion of the project. *Pardee's* discussion references the commercial reality of the

CGL market as giving contour to the reasonable expectations of policyholders and

additional insureds in this context, as follows:

> "Damage resulting from a subcontractor's work often does not arise
> for years. It is thus prudent for general contractors to obtain
> completed operations coverage as additional insureds from their
> subcontractors' insurers. . . . [A]dditional insured coverage is
> intended by the insurance industry to cover vicarious liability that an
> additional insured may incur due to operations of the originally
> named insured. Nor is there any dispute the endorsements were
> purchased so as to protect the general contractor against potential
> construction defect litigation." (*Pardee, supra*, 77 Cal.App.4th at
> pp. 1360-1361.)

It is well recognized that "*property damage resulting from defective construction*

*may occur over an extended period of time, spanning several policy periods.* [Citation.]

Consequently, it is common for a general contractor or developer to be insured under

several separate policies for the same construction liability. In such cases, the several

insurers on the risk may be required to share the costs of defense and indemnification."

(Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:1408.7, p. 7E-5; italics added.) It

is in this context that *Pardee, supra,* 77 Cal.App.4th at pages 1355 to 1359 addresses

whether "completed operations" coverage under the subcontractor's policy, for its

22

negligence, extends to the vicarious liability of an additional insured developer. The conclusion to be reached depends on the wording of the additional insured endorsement. (*Ibid.*; Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 7:1409.15-7:1409.16, pp. 7E-13 to 7E-14.)

Where, as here, the insurer has drafted the policy language, it is usually held responsible for ambiguous policy language, through the rule of construction in favor of the insured's reasonable expectations. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822–223.) If it is clear that an insurance policy was actually negotiated and jointly drafted, less attention is paid to protecting the insured from ambiguous or highly technical drafting. (*Ibid*.) American Safety wrote its own "manuscript" AIEs, which the named insurers obtained for Pulte. That sequence of events does not indicate there was approximately equal bargaining power in this case. This leaves us with the usual rule for resolving ambiguities against the insurer, to interpreting the potential scope of coverage under these specialized AIEs, as it relates to a duty to defend.

II

*DUTY TO DEFEND UNDER ADDITIONAL INSURED ENDORSEMENTS*

A. Effect of Summary Judgment/Adjudication Rulings

At the outset of trial, Pulte's section 592 motion sought a preliminary legal ruling that the denial of American Safety's motion for summary judgment served to establish a duty to defend as a matter of law. Pulte also relied on its own previous summary adjudication motion, granted as to Concrete's entitlement to a defense. Pulte sought a

23

legal ruling at trial to extend that duty to the two other subcontractors.[11]  Pulte cited to the American Safety denial letters as to the Foshay and Frontier policies, in which American Safety had reviewed the documentation provided and acknowledged the dates of the subcontracts, job file documents, and the AIEs, as well as the close of escrow dates for Pulte's sales of the allegedly defective homes.

Using those exemplars of American Safety's denial letters, Pulte's section 592 motion contended American Safety's correspondence admitted that there was a potential that the work performed by the named insureds had occurred within the identified policy periods, by setting forth the relevant close of escrow dates of sales of the completed homes.  Opposition by American Safety was filed, the matter was deferred, and the court proceeded to hear several days of testimony from each side.

In ruling on the section 592 motion at the conclusion of trial, the court observed, "We had a lot of evidence, a lot of testimony, documents, and everything else about ongoing operations, about sole negligence and those issues.  I am assuming the relevance of those in hindsight is whether it was reasonable or not for American Safety not to defend."  The court explained that American Safety had been unsuccessful throughout in seeking to implement its substantive interpretation of the policy language, and then ruled from the bench:

---

11     When denying American Safety's summary judgment motion, the court declined to resolve it on procedural issues such as noncompliance with the requirements of the rules of court on the format of the papers.  Instead, the court expressed a preference to reach the merits of the motion.  The fact that trial was still required to go forward at that point shows that some of the merits of the policy interpretation issues were still in flux.

"In the motion filed by [American Safety], the argument, at least as addressed in the summary adjudication, was not that there were not, in fact, operations, but rather the interpretation of the policy. And the ruling was not a factual ruling, but a legal rule. But nothing would change on that. The facts are still the same on that. Nothing changes. The policy is still the same. [¶] . . . [¶] So some of the issues were denied on questions of fact, material issues of fact. . . . I went into the arguments on both sides as opposed to simply saying that there was a failure on the initial burden of proof. [¶] So I think the traditional rule of *Montrose* [*I, supra*, 6 Cal.4th 287, 300-301; citations] applies. And the effect of the denial of American Safety indemnity's motion for summary judgment and summary adjudication established the duty to defend. And therefore, the issue I have to decide is whether or not the denials were reasonable or in good faith. [¶] . . . [¶] I think all of the facts adduced at trial are still relevant as to reasonableness. [¶] . . . [¶] So go ahead . . . ."

Although we accept that the trial court's summary adjudication ruling establishing there was a duty to defend (as to Concrete) served to limit the legal issues presented at trial, we also acknowledge that other arguments on the potential for coverage were developed during trial. After it heard the evidence, the court essentially confirmed its previous rulings on the pretrial motions, consistent with its understanding of the explanation in *Montrose I, supra*, 6 Cal.4th at pages 300 through 301, of the extent of the binding effect of a summary judgment ruling in this context. (See *McMillin, supra*, 233 Cal.App.4th 518, 541.) The court accordingly told counsel that the evidence already presented about the coverage and exclusions issues was now to be considered on the bad faith questions, as part of the evaluation of the reasonableness of the denials of defenses.

To some extent, this appeal reargues the same policy interpretation issues on the potential for coverage, under its completed operations and ongoing operations language. However, many of the issues for which the trial court found the existence of triable

25

material facts have essentially been dropped out of the appeal (e.g., the self-insured retention, other insurance, and sole negligence). The better approach now is to assess the merits of the trial court's various, consistent coverage rulings on a de novo basis, concerning the duty to provide a defense, and then to decide the closely related reasonableness issues on the bad faith claims (pt. III, *post*).

B. Nature of Potential Coverage under Policies

The terms of the AIEs must be read in light of the definitions and coverage provisions of the policies. Pulte was named as an additional insured "but only with respect to liability arising out of 'your work' *and only as respects ongoing operations* performed by the Named Insured for the Additional Insured on or after" the endorsement's effective date. (Italics added.)[12] Another typical version states:

> "WHO IS AN INSURED (SECTION II) is amended to include as an insured the person or organization shown in the Schedule, *but only with respect to liability arising out of 'your work' which is ongoing* and which is performed by the Named Insured for the Additional Insured on or after the effective date of this Endorsement." (Italics added.)

" 'Your work' " includes warranties as to fitness and quality. Within the " 'products–completed operations hazards' " definitions, " 'your work' " is deemed complete either when the work (a) called for in the contract is

---

12    As noted, some of the policies replace the italicized "*and*" in these AIEs with "*but*."

26

complete; (b) at a particular job site is complete; or (c) is put to its intended use.

The reader will recall that the declarations pages offer coverage for "products–completed operations hazard," defined as including all property damage occurring away from the insured's premises, "arising out of 'your product' or 'your work' " (except for incomplete or abandoned work; not applicable here).

### 1. Respective Arguments

American Safety argued the underlying construction defect complaints failed to allege any ongoing operations as of the time the homeowners bought the homes, and therefore no potential for coverage existed. (But see *D.R. Horton Los Angeles Holding Co., Inc. v. American Safety Indem. Co.* (S.D.Cal., Jan. 5, 2012, No. 10CV443WQH) 2012 U.S. Dist. LEXIS 1881, at pp. *53-*54 (*D.R. Horton*) [additional-insured coverage could exist for ongoing operations, if work on other phases of the development continued after completion of the particular homes sued upon].) American Safety claims that once the defective homes were sold, only completed operations coverage could have applied, but it was successfully excluded by including their ongoing operations language in the AIEs. It believes its AIEs had complied with the "roadmap for carriers" created by *Pardee*, *supra*, 77 Cal.App.4th 1340 on how to insure named insureds, but without granting coverage for completed operations to additional insureds. This was done through its "project on file" restriction (Foshay only, through 2004 only) and its "ongoing

27

operations" language, which American Safety used as tools to limit its coverage exposure.

American Safety's trial attorney contended that in the AIEs, " 'ongoing operations' immediately follows 'your work.' So it has to be read as a limitation upon 'your work.' 'Your work' cannot be read without the limit of 'ongoing operations.' " On the issue of ongoing operations, American Safety took the position that its "ongoing operations" language contained in the AIEs should be read as a restricted grant of coverage, not an exclusion, but part of the actual grant. It further argued Pulte had failed to establish that it was an insured under this grant of coverage, because "construction defect claims by their very nature are completed operations claims as the product has been completed and put to its intended purpose; namely, it's been sold to homeowners who are now suing."

Next, to the extent that a subcontractor caused damage to the project itself during its ongoing operations, American Safety argued that the faulty workmanship exclusions (j.(5) and (j.(6)) applied to preclude any duty to defend.

For purposes of discussion, the trial court summarized Pulte's position as claiming that its reasonable expectation, in requiring its subcontractors to obtain their own completed operations coverage and to provide it with additional insured status, was to obtain the same coverage for itself. The court surmised that when the subcontractors went to American Safety, they obtained and provided "something and it says 'your work' and it says something about completed operations. It's kind of confusing. [Pulte says], 'Well, that probably satisfies, so we're okay.' We don't find out until -- that's the argument." Pulte was thus arguing that if the American Safety AIEs had expressly stated

28

there would be no completed operations coverage, then the developer would have understood that, and would have told the subcontractors, "Go back and try again," to obtain more complete additional insured coverage.

  *2. Distinctions on Appeal: Completed Operations and Ongoing Operations*

  Pulte's request for a defense arose out of the named insureds' participation in construction work that was done over a period of time, in several phases. American Safety contends that the AIEs it drafted contain language that expressly limited the time frame of such coverage to the time of the ongoing operations of the named insureds (i.e., before completion). (See *Pardee, supra*, 77 Cal.App.4th at p. 1356.) It argues we must give each term in the endorsement its proper effect, and to do so, the ongoing operations reference in the AIEs should be read as a limitation upon "your work," and as to when it occurred.

  In its reply brief, American Safety represents that the issues at trial were mainly litigated in terms of the existence of any completed operations coverage, but that on appeal, Pulte's respondent's brief seems to argue that there was a potential for coverage under either type of coverage, completed operations and/or ongoing operations. American Safety contends that the policy clearly distinguishes between liability for ongoing versus "completed operations" coverage. It says these coverages are time sensitive and "complementary and not overlapping." (See *Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 499-506 (*Fibreboard Corp.*) [addressing coverage under a "products hazard" clause containing a special asbestos

exclusion in a policy issued to a manufacturer of asbestos-containing products].)  As

explained in *Fibreboard Corp.*:

> "[A] manufacturer or person who performs a service can incur
> liability in a number of ways, including '(1) while work is in
> progress, [and] (2) after completion. . . .  An injury or loss may
> result while an activity is in progress, and prior to the completion
> thereof, either as a result of an act of negligence or an omission.
> Such liability is embraced within the ordinary liability aspect of a
> public liability policy under coverage for premises-operations.  [¶]
> . . . [O]nce a product has been completed and sent to market . . .
> liability may be incurred by reason of a defect in merchandise or
> improper workmanship.  It should be clear that the premises-
> operations coverage is not appropriate coverage and the individual
> now needs 'products liability' or 'completed operations' coverage.
> The coverages are complementary and not overlapping . . . .'
> [Citation.]  Thus, as a matter of sequencing, 'it is well to recognize
> that products liability is a coverage that takes over where premises-
> operations leaves off . . . .' "  (*Fibreboard Corp., supra,* 16
> Cal.App.4th 492, 500-501.)

This authority indicates that there may be a clear distinction among products

liability claims concerning a completed product, compared to other liability claims for

work in progress.  (*Fibreboard Corp., supra*, 16 Cal.App.4th at pp. 500-501.)  That is a

different context and type of work from the case before us, arising in the context of

construction defects in which one faulty component or portion of a subcontractor's work

could allegedly have caused physical injury to nearby work.  Since we are evaluating

only a potential for coverage, as related to a duty to defend and on a de novo basis, we

must consider the language of the AIEs for any or all type of coverage they may afford.

(*Pardee*, *supra*, 77 Cal.App.4th at p. 1351 [court considers occurrence language in the

policy with the endorsements to determine whether coverage included in the policy terms

is broadened].)

### 3. Timing of Alleged Property Damage

A standard occurrence based CGL policy potentially provides coverage for injury or damage even if it may not have been discovered or manifested until after the policy period ended. (*Century Indemnity Co. v. Hearrean* (2002) 98 Cal.App.4th 734, 743.) American Safety's initial argument seems to be that we should evaluate the construction defect complaints as alleging injury that did not occur until the date of purchases by the individual home buyers, of completed homes. It is claiming that there were no longer any ongoing operations by the subcontractors, once the homes were completed.

When Pulte tendered its defense, American Safety was notified of allegations that the subject homes contained violations of construction standards, leading to existing and anticipated property damage from moisture that was invading the faulty concrete, electrical, or waterproofing work. With regard to the timing of alleged property damage, the *Schaefer* action alleged that within the past 10 years, the defendants, as original owners or developers of the project, had constructed the homes, which since their completion, "have become known to be defective as herein alleged," in that they are not adequately constructed to prevent water intrusion. Such construction was alleged to have been done in an improper fashion, resulting in the homes' water damage as a direct and proximate consequence.

The *Large* complaint alleged that Pulte had performed construction and development of the homes, which were substantially completed within the last 10 years. *Large* alleged that the defendant real estate developers and their agents had failed to meet residential construction standards for components such as waterproofing systems,

31

electrical systems, and concrete, and that many of the violations were causing property damage to their homes.

Exposure to liability under a policy is evaluated according to the specific language under review, to reconcile the effect of related elements in the CGL policy. (*Baker v. National Interstate Ins. Co.* (2009) 180 Cal.App.4th 1319, 1337-1339 (*Baker*).) Under these policies, " 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" includes: "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it . . . ." None of this language requires "that the eventual claimant own the property at the time the property is damaged for coverage to ensue." (*Garriott Crop Dusting Co. v. Superior Court* (1990) 221 Cal.App.3d 783, 791.) In any event, there was a lack of evidence about when the subcontractors' work was performed at the defective homes.

These policy terms may be read to cover construction work that creates "physical injury to tangible property," such as from exposure to moisture leakage, due to the nature of concrete or electrical work that was performed during the effective periods stated in the AIEs. Physical injury to the homes' foundations and walls, as established by inspections, is clearly alleged in the underlying construction defect complaints, and is not tied to the current owners' finances. Attorney Huerta generally testified that defects lists could be updated during litigation. The trial court agreed, "construction defect litigation is notoriously fluid. Claims omitted from one defect list pop up on a later defect list.

While [American Safety] is not required to speculate on future claims, the [inspection] reports do not establish there was no potential for coverage after their preparation." The creation of reported defects in the concrete and electrical work performed, as an occurrence during the policy period, could have allowed continuous or repeated exposure to harmful conditions elsewhere.

" ' "[T]he existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit. [Citation.] Hence, the duty 'may exist even where coverage is in doubt and ultimately does not develop.' " ' '" (*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1033 (*Atlantic Mutual*).) Where insuring agreements provide coverage for property damage occurring during the policy periods, a construction defect complaint alleging progressive damage gives rise to the potential " 'that there existed—at least potentially—a covered event, i.e., a continuing and progressively deteriorating process which began with defective design and construction . . . within the pertinent policy period.' " (*Century Indemnity Co. v. Hearrean*, *supra*, 98 Cal.App.4th 734, 740.) American Safety incorrectly focuses on when the current property owners became financially damaged through purchases. This begs the question of when the subject property damage occurred from the work of the subcontractors. The coverage potential depends on when the property became physically damaged. (*Standard Fire Ins. Co. v. Spectrum Community Assn.* (2006) 141 Cal.App.4th 1117, 1132; *Garriott v. Crop Dusting Co.*, *supra*, 221 Cal.App.3d 783, 791.)

From the circumstances shown in the tenders of defense, in which property damage became evident after the work was completed, American Safety was placed on sufficient notice that some of the subcontractors' work could have been ongoing and/or completed during its policy periods, since the homes were constructed in phases. At that time, the mechanisms of the alleged property damage remained unknown, as did the timing of the damage in relation to the dates of purchase. As the trial court's decision correctly observed, the damage or occurrence might have occurred "while the subcontractor's operations were ongoing but after the house had been sold to one of the plaintiffs." We disagree with American Safety's claim that it should not have had to respond to these defense demands, without a greater showing that its policy applied, based on the subcontractors' work and Pulte's potential vicarious liability for it.

As explained in *Montrose I,* in the comparable legal context of a declaratory relief action, "[t]o prevail [] the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential. In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot. Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales. Any seeming disparity in the respective burdens merely reflects the substantive law." (*Montrose I, supra*, 6 Cal.4th at p. 300; *Pardee*, *supra*, 77 Cal.App.4th at p. 1351 [" 'when a suit against an insured alleges a claim that potentially or even possibly could subject the insured to liability for covered damages, an insurer

34

must defend unless and until the insurer can demonstrate, by reference to undisputed facts, that the claim cannot be covered.' "].)

Under this authority, American Safety cannot show that Pulte, as its additional insured, "failed to timely provide information to an insurer that would have established the potential for coverage in the first instance." (*Atlantic Mutual*, *supra*, 100 Cal.App.4th 1017, 1040.)

### 4. *"Ongoing Operations" as a "Limiting Term" or Exclusion?*

American Safety next argues there was no possibility of products-completed operations hazard coverage applying here, because it had inserted the following italicized qualifier into the AIEs, that policy benefits would be afforded for "liability arising out of 'your work,' '*but only as respects ongoing operations.*' "   It calls this "ongoing operations" language "a limiting term *excluding* completed-operations coverage," and argues that its use of different terms in the policy was evidently intended to afford different meanings for them.  (See *Weitz Company, LLC v. Mid-Century Insurance Co.* (Colo. App. 2007) 181 P.3d 309, 313 [interpreting policy term "completed operations" as extending such coverage to named insured/subcontractor, but finding the term "ongoing operations," used in conjunction with "only" in the endorsement, served to limit the coverage provided to general contractor/additional insured].)

Attorney Fisher testified that she knew of one contracting company that had paid as much as $100,000 to obtain more completed operations coverage than was afforded in its AIEs.  American Safety now argues it can be inferred (apparently from the lower price of the AIEs, which is unclear from the briefing) that it did not intend to provide

35

completed operations coverage to Pulte. It relies on language in *Baker*, *supra*, 180 Cal.App.4th 1319, that describes the costly nature of products-completed operations hazard coverage: " 'The modern CGL policy provides basic "premises and operations" coverage. This coverage insures for damages arising out of an occurrence at the insured's place of business as a result of the insured's ongoing business activities. The risk covered by the CGL premises and operations coverage differs from the risk posed once an insured relinquishes its products to third parties or completes its work. This latter risk is insured, *for an additional hefty premium*, under the products-completed operations hazard coverage. The purpose of the products-completed operations hazard coverage is to insure against the risk that the product or work, if defective, may cause bodily injury or damage to property of others after it leaves the insured's hands.' " (*Id.* at p. 1337, italics added.)

American Safety's interpretation fails to demonstrate any coverage is potentially limited to ongoing operations. The AIEs' language allowing coverage for "liability arising out of 'your [the named insured subcontractor's] work' " can reasonably be read as a grant of coverage for the insured's completed operations, if property damage ensued from them. As noted in *Pardee*, *supra*, 77 Cal.App.4th at page 1356, " 'your work' is further defined in the policies as including warranties and representations. Liability arising out of such inherently involves completed work, not work in progress."

It is well accepted as a commercial reality that construction work performed at one time may deteriorate or manifest injury or damage, possibly to adjacent work, at a later time or after completion. (*Pardee*, *supra*, 77 Cal.App.4th at pp. 1360-1361.) Unlike in *Pardee,* where the policies were issued postconstruction, the subject AIEs were issued

36

during construction, while the subcontractors were still working on different phases of the projects. Both sets of insureds could reasonably have expected that if the subcontractors had bought completed operations coverage for the work, it also applied to vicarious liability of the developer, if property damage problems appeared. (*Id.* at p. 1350.) These AIEs do not clearly restrict coverage to only ongoing operations, simply by linking the ongoing operations phrase to the "liability arising out of the work" clause. (*Id.* at pp. 1359-1360.) We should give effect to each of the phrases defining the scope of coverage.

The court's decision stated that American Safety had failed to clearly state in the AIEs that completed operations are not covered, and failed to restrict coverage as applicable only to ongoing operations. Instead, "*ASIC has taken a middle-ground and left the language in that the endorsement applies to 'your work' but limited to ongoing operations and therefore creating an ambiguity.* Had ASIC wished to make it clear to Pulte that it was not covering completed operations for the additional insured (which its policy covers for the named insured), ASIC could have clearly said so." (Italics added.) We agree that the AIEs are ambiguous in combining these two types of coverage in one clause. They "failed to expressly limit covered completed operations as to time or particular project in their policy and endorsement language." (*Pardee, supra,* 77 Cal.App.4th at p. 1357.) They are not "expressly limiting the time frame of the additional insured coverage to the time of the ongoing operations of the named insured." (*Id*. at p. 1356.) They do not adequately define " 'your work' as work 'now being performed or to be performed during the term of this policy.' " (*Ibid.*)

37

If this "ongoing operations" language is meant as an exclusion, it must be narrowly construed. (*Waller, supra*, 11 Cal.4th at p. 16.) Assuming that the subcontractors carried out ongoing operations "*on or after the effective date of the endorsement,*" their work was performed during the policy period and coverage was not clearly excluded.

For purposes of determining a defense duty, the AIEs seem to allow completed operations coverage, based on potential liability that might yet arise from the subcontractors' completed work. Next, the policies add another form of coverage, for "ongoing operations . . . on or after the effective date of this Endorsement." We do not understand that purported "ongoing" limitation to be clearly undoing a grant of coverage against liability arising from work completed during the effective dates of the AIEs. If the "ongoing operations" language was meant by American Safety to preclude coverage for completed operations losses, it had to expressly state "that coverage was limited to claims arising from work performed during the policy period." (*Pardee*, *supra*, 77 Cal.App.4th at p. 1358.) We cannot say the underlying complaints pleaded zero facts bringing Pulte within potential policy coverage. Assuming there was doubt as to whether the duty to defend existed, it should have been resolved in favor of the additional insureds.

### C. Effect of Faulty Workmanship Exclusions

American Safety's alternative grounds for denying a defense to Pulte included its faulty workmanship exclusions. In exclusion j.(5), the subcontractors' policies state that no coverage is afforded for "property damage" to "[t]hat particular part of real property

38

on which *you . . . are performing operations*, if the 'property damage' arises out of those operations[.]"  (Italics added.)  In exclusion j.(6), coverage is precluded for "[t]hat particular part of any property that must be restored, repaired or replaced *because 'your work' was incorrectly performed on it*."  This exclusion j.(6) "does not apply to 'property damage' included in the 'products-completed operations hazard.' "  (Italics added.)

"[A]n insurer may only defeat an existing potential for coverage by undisputed facts that conclusively negate such coverage.  This is particularly true where the insurer seeks to defeat coverage by reliance on an exclusion.  An insurer may rely on an exclusion to deny coverage only if it provides conclusive evidence demonstrating that the exclusion applies."  (*Atlantic Mutual*, *supra*, 100 Cal.App.4th at pp. 1039-1040; *Waller, supra*, 11 Cal.4th at p. 16 [exclusions will be narrowly construed].)

"Where a term used in an insurance policy is not defined, it must be interpreted in its ' "ordinary and popular sense.' '  [Citation.]  Although exclusions are generally viewed through a more critical prism, the principle that words are considered in their 'ordinary and popular sense' is not discarded, and, thus, in interpreting a word in an insurance policy, including a word in an exclusion, a court may consult and consider definitions found in a common dictionary, provided the court does not disregard the policy's context, and maintains an eye on the fundamental goal of deciding how a layperson policyholder might reasonably interpret the exclusion's language."  (*Baker*, *supra*, 180 Cal.App.4th at p. 1340.)

American Safety cites to authority that a general contractor or developer's work product includes all work at the site, including that of the subcontractors.  (E.g., *Diamond*

39

*Heights Homeowners Assn. v. National American Ins. Co.* (1991) 227 Cal.App.3d 563, 573; *George F. Hillenbrand, Inc. v. Insurance Co. of North America* (2002) 104 Cal.App.4th 784, 805 ["In the case of a general contractor, all the work at the project is considered its work product, whereas in the case of a subcontractor, . . . only its portion of the work, such as siding, is the work product and damage to other parts of the project is considered damage to other property."].)[13] This approach disregards the pleaded facts in the underlying complaints, that some of the numerous subcontractors' work was allegedly defective and therefore caused problems with other interrelated and adjacent construction work at the projects. American Safety did not justify its denial of the defense by establishing the precise timing of the subcontractors' work or consequently, the nature of the alleged construction defect property damage.

The trial court expressed concerns that when the coverage and exclusionary terms of the AIEs were combined, only an illusory degree of coverage would be available. (See *Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 94-95 [coverage not illusory even where a special coverage condition might not arise].) American Safety disagrees, interpreting its own policy as supplying an additional insured with ongoing operations coverage that could have arisen during the work, but only as follows: "Thus, Pulte would have been covered, for instance, if a piece of improperly-secured plywood

_____

13     American Safety quotes another exclusion, j.(l), "Damage to Your Work," as excluding coverage for "property damage" to the insured's work "arising out of it or any part of it and included in the 'products-completed operations hazard.' " On appeal, it does not actively argue the applicability of this exclusion.

blew off and hit a passerby or damaged an adjacent already-sold and occupied home, or grading work caused earth movement and landslides in an adjacent development. Although not illusory, the coverage is limited; it is drafted and priced that way and it is exactly what the subcontractors and Pulte bargained for." Because of these cited policy exclusions, American Safety argues there could be no coverage "for injuries arising out of the work itself, e.g., construction defects."

The problem with these exclusionary arguments is that the record does not contain a showing by the insurer that all of the damage the homeowners were claiming was limited to the particular location where one or another of the subcontractors was performing their work, such that these policy exclusions would clearly apply. (*Roger H. Proulx & Co. v. Crest-Liners, Inc.* (2002) 98 Cal.App.4th 182, 201-203 (*Roger H. Proulx & Co.*); *Montrose I*, *supra*, 6 Cal.4th 287, 298.) As far as the construction defect complaints disclose, there were potentially overlapping forms of damage among the different locations of concrete, electrical and other types of work, all of which had permitted some kind of moisture damage to occur over time. It was factually unclear under exclusion j.(5) that no coverage was possible for property damage located at the site of each named insured's operations, or if the alleged damage arose solely out of those particular operations.

With respect to exclusion j.(6), coverage would be precluded for damage to portions of property "that must be restored, repaired or replaced *because 'your work' was incorrectly performed on it*." The construction defect complaints broadly allege that both work and materials were defective, and American Safety did not supply a showing that

41

each of the named insureds' work was incorrectly performed such that no possible basis for coverage could have existed, on a vicarious liability basis. Once again, there was no reliable way shown for determining, at the outset of the construction defect matters, which subcontractors' work had been substandard or whether it had damaged its own or another's adjacent work. As of the time of tender, those claims could have involved damage from one or more types of work done at the projects. The faulty workmanship exclusions did not clearly apply to preclude a duty to defend. (*Roger H. Proulx & Co. Inc.*, *supra*, 98 Cal.App.4th at pp. 202-203.)

III

*RELATED FINDINGS ON BAD FAITH LIABILITY*

A. Requirements for Liability

Having determined there was a breach of the duty to defend from which Pulte was damaged, the trial court's decision after trial next addressed the question of whether American Safety had "unreasonably and without proper cause" failed to defend Pulte in the construction defect matters. Citing to various forms of evidence presented at trial on American Safety's claims handling practices, the court concluded the company had breached the policy's implied covenant of good faith and fair dealing in numerous ways. To the extent factual findings were made on conflicting evidence about the insurer's conduct and motives, we must evaluate this challenged portion of the judgment for any substantial support in the evidence. (*Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 511 (*Dalrymple*).) "Bad faith in this context is said to be conduct violating community standards of decency, fairness or reasonableness." (*Ibid.*)

42

To the extent the trial court drew legal conclusions about policy obligations, de novo review is appropriate. "Although an insurer's bad faith is ordinarily a question of fact to be determined by a jury by considering the evidence of motive, intent and state of mind, '[t]he question becomes one of law . . . when, because there are no conflicting inferences, reasonable minds could not differ.' " (*Dalrymple*, *supra*, 40 Cal.App.4th 497, 511; *Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 973, fn. 1 [reasonableness of an insurer's legal position depends on precedent and statute, posing questions of law].)

The determination of the reasonableness of an insurer's contractual position takes into account not only the rules of contract interpretation (e.g., construing ambiguity in favor of insured), but also the given factual context in which the dispute arises. (*Griffin Dewatering Corp., supra,* 176 Cal.App.4th 172, 208; *Bank of the West v. Superior Court, supra,* 2 Cal.4th 1254, 1265 [language must be construed in context].) "However, the question of whether there is an ambiguity in the first place is different. [N]othing obligates insurance companies to pay 'noncovered' claims just because such a payment will (obviously) benefit the policyholder." (*Griffin Dewatering Corp.*, *supra*, at p. 208; *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1148 [insurance companies do not stand in a fiduciary relationship with policyholders, but that relationship may be "akin" to a fiduciary one].)

It is well settled that "an insurer's erroneous failure to pay benefits under a policy does not necessarily constitute bad faith entitling the insured to recover tort damages. '[T]he ultimate test of [bad faith] liability in the first party cases is whether the refusal to

43

pay policy benefits was unreasonable.' [Citations.]  In other words, 'before an [insurer] can be found to have acted tortiously, i.e., in bad faith, in refusing to bestow policy benefits, it must have done so "without proper cause." ' "  (*Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1205 (*Opsal*); *Dalrymple*, *supra*, 40 Cal.App.4th 497, 513.)  The issues include the reasonableness of American Safety's policy interpretation, and the effect of its claims handling that resulted in withholding of benefits due under the policy.

B.  Initial Legal Issue:  Erroneous Policy Analysis

We first take note that the trial court did not find it was dispositive that even after the summary adjudication ruling on the Concrete policy (i.e., that a defense duty was owed to Pulte as an additional insured), American Safety continued to withhold a defense as to each of the policies.  However, the court did observe that American Safety had not filed an appellate challenge to that ruling, which was consistent with Attorney Fisher's testimony about its apparent overall strategy to pursue its own policy interpretation, without obtaining further guidance from the courts (avoiding it by settling cases).  The court expressed a belief that such a continuing policy of denying a defense could be viewed as putting the insurer's interests above those of the insured, by avoiding adverse legal precedents.  Here, as in *McMillin*, *supra*, 233 Cal.App.4th 518, 542, footnote 31, we need not address the availability of the "genuine dispute doctrine" as a defense for the insurer in a third party duty to defend context.  (See *Opsal*, *supra*, 2 Cal.App.4th 1197, 1205-1206; *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1424 [law is unclear on this point].)

44

In any event, the most basic policy interpretation questions in this case had already been fully addressed in the breach of contract phase of trial, on the effect of the policy language, both "liability arising from 'your work' " and " 'ongoing operations.' " The court did not accept American Safety's contractual no coverage position, and it was additionally required to examine whether that interpretation had been reasonable, for purposes of determining the remaining bad faith liability issues. The court found it significant that American Safety knew there were trial court decisions against its position on the interpretation of ongoing operations (e.g., *D.R. Horton, supra,* 2012 U.S. Dist. LEXIS 1881; *Tri-Star Theme Builders, Inc. v. OneBeacon Insurance Co.* (9th Cir. 2011) 426 Fed.Appx. 506 [Arizona case]; *McMillin Construction Services, L.P. v. Arch Specialty Insurance Company* (S.D.Cal. 2012) 2012 U.S. Dist. LEXIS 8339; and *Jaynes Corp. v. American Safety Indem. Co.* (D. Nev. 2012) 925 F.Supp.2d 1095, vacated Dec. 2, 2014).

For example, in *D.R. Horton, supra,* 2012 U.S. Dist. LEXIS 1881, an unreported case arising out of federal court in San Diego, American Safety was the defendant and was well aware of its holding. The trial court's decision outlined the logical reasoning of *D.R. Horton*, and its applicability in this factual context, as follows:

> "Thus, if [the *D.R. Horton]* homes were built in a series so that one home was completed and then the subcontractor's ongoing operations continued on another house, and if there was an occurrence causing damage to the already-completed houses, then the occurrence potentially was during ongoing operations. This potential existed in the *Large* and *Schaefer* cases. The information available to ASIC at the time of the denials was that the work could have been ongoing at the time some of the houses were completed. Therefore, there was the possibility that the damage or occurrence

45

occurred while the subcontractor's operations were ongoing but after the house had been sold to one of the plaintiffs."

In addition, the trial court relied on *Pardee, supra*, 77 Cal.App.4th 1340, and ruled that American Safety's interpretations were incorrect, as follows: "If ASIC's position is correct, there would never be property damage coverage under the additional insured endorsement, whether the occurrence happened during ongoing operations or after completed operations." (*Id*. at p. 1359.) The court ruled that the policy was ambiguous in referring to property damage, and the interpretation American Safety was using did not properly account for the reasonable expectations of an additional insured. Moreover, "ASIC was aware at the time it issued the endorsement that the contracts between Pulte and the named insureds required that the named insureds name Pulte as an additional insured, including completed operations. . . . The information available to ASIC at the time of the tender of the claim was that Pulte had been named as an additional insured and that the contract with the named insured required that the additional insured endorsement cover completed operations. With that in mind, ASIC should have taken into account the reasonable expectations of the additional insured in interpreting its policy. ASIC did not do this and did not give equal consideration to its interests and its insureds' interests."

With regard to bad faith, the trial court found it significant that American Safety, by referring to the dates of the close of escrow for the homes and the policy periods, had essentially conceded that the subcontractors had performed work on the project during the effective periods of its own policies. Although many out-of-state authorities had been

46

discussed at trial on whether "ongoing operations" excluded coverage, American Safety had not produced any California case that ruled in its favor. Also, when Fisher testified about American Safety eventually prevailing in *McMillin Construction Services, L.P. v. Arch Specialty Insurance Company, supra,* 2012 U.S. Dist. LEXIS 8339, she did not reveal that the company succeeded because of its "project on file" clause there, not on ongoing operations.

As to American Safety's reiterated claim that no relevant work had been done during a relevant policy period, the trial court found it had unjustifiably ignored "the possibility of an occurrence during the insured's ongoing operations as in *D.R. Horton*[, *supra,* 2012 U.S. Dist. LEXIS 1881]." That approach, combined with the company deciding to ignore "other adverse court decisions from Federal Courts in California and Nevada and the reasoning of the Ninth Circuit, is not reasonable and is bad faith." As a matter of policy interpretation, we conclude that the trial court's legal ruling that American Safety did not have legitimate reasons for denying a defense to this additional insured is well supported.

C. Evidence Regarding Claims Handling; No Proper Cause to Deny a Defense

The trial court's written decision from this phase of trial cited to numerous factors that played a part in American Safety's decision to deny Pulte a defense to the construction defect actions. These were drawn from testimony from its claims representatives and corporate claims counsel, about how hundreds of additional insureds' claims were routinely denied based on the restrictive policy interpretations offered. The court observed, "The three adjusters who testified did not recall ever accepting an

47

additional insured tender." One of the claims adjusters testified that even if the property damage occurred during ongoing operations, "ASIC still would not provide a defense because there would be no coverage and no duty to defend because the suits were filed after completion." Attorney Fisher testified about uniformly denying any AIE coverage requests, based on "ongoing operations" only.

Documentary evidence was submitted about the refused tenders, showing the terms of the various denial letters. Examination of those denial letters on the various policies shows the trial court had ample reasons for concluding they are form letters, rather than the product of any appropriate case-by-case analysis. For example, the letters deny coverage on the basis of a supposed requirement that only "projects on file with the Company" may be covered, even though only some of the Foshay policies and none of the Concrete or Frontier policies contain any such language. The court said, "This shows that claims were not being reviewed carefully, if at all. This is further evidence of bad faith."

Although American Safety no longer argues the applicability of its policy requirements on sole negligence, that reason was given for denials of the tenders. The court found that was not a good faith ground to assert there was no potential for coverage, because the standard construction defect action names many defendants and cross-defendants and therefore sole negligence was not normally alleged in such an underlying complaint. The court stated, "[t]o provide coverage of sole negligence only if sole negligence is alleged, effectively means that no coverage would ever be provided under an additional insured endorsement." Moreover, the court noted that a jury could find that

48

although many defects in the development were alleged, only one named insured's work was actually defective and negligent. Accordingly, "the routine denial of coverage for hundreds of tenders based on sole negligence shows a complete lack of analysis and is evidence of bad faith. Such a conclusion is not reasonable if one were to analyze the claims made in the [underlying construction defect] cases."[14]

As already discussed, American Safety made an unreasonable reading of its policy language by focusing on the ongoing operations language, to the exclusion of other relevant policy terms in the AIEs it drafted. The policy's ambiguous terms had to be construed in favor of the reasonable expectations of the insureds. American Safety inexplicably disregarded case law known to it, such as *D.R. Horton, supra,* 2012 U.S. Dist. LEXIS 1881, which the court found would indicate there was a potential for coverage even on a completed operations basis, because "[t]he information available to ASIC at the time of the denials was that the work could have been ongoing at the time some of the houses were completed. Therefore, there was the possibility that the damage or occurrence occurred while the subcontractor's operations were ongoing but after the house had been sold to one of the plaintiffs."

---

[14] The court only generally discussed American Safety's assertion of the self-insured retention grounds for denial of a defense, and the confusion about how much of a defense Interstate was providing Pulte. American Safety also argued that no valid AIEs could be issued by brokers for the named insureds, but the court said that did not make any difference to a coverage determination. We need not discuss those issues as they are not dispositive with respect to the bad faith findings.

49

To the extent the denial letters claimed the faulty workmanship/work product exclusions must apply, they were not supported by a reasonable policy interpretation. There could have been a potential for coverage to damaged adjacent work or other building components, compared to the work of Concrete, Frontier, or Foshay.

From all of the evidence, the court concluded American Safety's corporate claims counsel and representative at trial, Jean Fisher, appeared to function as the final authority for its decisions to deny coverage. The court evaluated her evidence as follows: "Although she worked for companies controlled by ASIC and not directly for ASIC, no one from ASIC ever disagreed with any of her decisions. [¶] Ms. Fisher was aware that subcontractors used the additional insured endorsement to get work and that developers require completed operations coverage. Nevertheless, it was her intent to deny completed operations coverage with the language she drafted. She testified that developers are unreasonable in believing they would receive a defense from ASIC under the additional insured endorsement. [¶] The Court did not find Ms. Fisher candid. When asked whether any court had ever ruled in ASIC's favor on ongoing operations, Ms. Fisher replied that she could not recall. Obviously, had there been such a decision, Ms. Fisher would have remembered it and ASIC would have used it to its benefit. [¶] . . . [¶] Ms. Fisher stated that the adjusters were well trained and constantly given updates on the law. The testimony of the three adjusters called in this case indicates otherwise, for example, none of them understood Project on File, yet they used that term to deny coverage even when it was not in the policy. [¶] When examined on the use of Project on File, especially given that the adjusters were using that as a basis of denial in letters

50

supposedly approved by her and since the adjusters did not even know how to determine if the project was on file, Ms. Fisher's testimony became very evasive."

The court made reasonable conclusions from all of the evidence that American Safety was primarily looking out for its own interests in refusing to defend its additional insureds. "Whether the Court considers the multiple tenders by Pulte, the hundreds of denials of other additional insureds, as testified to by the adjusters, or merely the tenders in this case, there is a clear pattern and practice of refusing to defend additional insureds in construction defect cases." In light of Pulte's additional insured status and the notice it gave to American Safety that it had been sued on wide ranging construction defect theories, the failure to provide Pulte with a defense was unreasonable and without proper cause. These actions were properly found to be in bad faith.

The court additionally evaluated the same evidence as providing a clear and convincing showing of malice and oppression, and proceeded on the punitive damages claims, as next discussed. (Civ. Code, § 3294.)

IV

*PUNITIVE DAMAGES: ENTITLEMENT ISSUES ONLY*

A. Applicable Standards

In this phase of trial, the court was considering whether the breach of the insurer's duty to defend was not only unreasonable, so as to warrant tort damages, but also if the breach was "so egregious that there is evidence of 'oppression, fraud or malice' " to warrant a punitive damages award. (*Griffin Dewatering Corp.*, *supra*, 176 Cal.App.4th 172, 194-195.)

51

Under section 3294, subdivision (b), punitive damages can properly be awarded against a corporate entity as a principal, because of an act by its agents, if the corporate employer authorized or ratified wrongful conduct. Ratification is shown if an officer, director, or managing agent of the corporation has advance knowledge of, but consciously disregards, authorizes, or ratifies an act of oppression, fraud, or malice. " 'The determination whether employees act in a managerial capacity [i.e., are managing agents] does not necessarily hinge on their "level" in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.' " (*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 421.)

The definitions in Civil Code section 3294, subdivision (c)(2) include the following: " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." For an award of punitive damages to withstand review, it must be supported by substantial evidence. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891.) "As in other cases involving the issue of substantial evidence, we are bound to 'consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment.' [Citation.] But since the [factfinder's] findings were subject to a heightened burden of proof, we must review the record in support of these findings in light of that burden. In other words, we must inquire whether the record contains 'substantial evidence to support a determination by clear and convincing evidence . . . .' " (*Ibid.*)

"It is important to recognize the reason for the possibility of tort, and perhaps even punitive damages on top of regular tort damages, for an insurance company's unreasonable breach of an insurance contract. Insurance contracts are unique in that, if the insurance company breaches them, the policyholder suffers a loss (often a catastrophic loss) that cannot, by definition, be compensated by obtaining another contract. [Citations.] [¶] Thus, without the possibility of tort damages hanging over its head when it makes a claims decision, an insurance company may choose not to deal in good faith when a policyholder makes a claim. The insurance company could arbitrarily deny a claim, thus gambling with the policyholder's 'benefits of the agreement.' [Citation.] If the insurance company gambled wrong, it would be no worse off than it would have been if it had honored the claim in the first place. In effect, if the law confined the exposure of the insurance company under such circumstances to only contract damages, it would be pardoned and still retain the fruits of its offense." (*Griffin Dewatering Corp.*, *supra*, 176 Cal.App.4th 172, 195-196.)

## B. Analysis

In ruling that an award of punitive damages was justified, the trial court's decision stated that American Safety had demonstrated its "pattern and practice" of using every conceivable argument to deny coverage, whether the arguments are weak or strong, valid or invalid. Such conduct showed the company was primarily protecting its own interests in refusing to defend its additional insureds in construction defect cases. Based on the evidence given by Attorney Fisher and the adjusters she supervised in issuing hundreds of other denial letters in this context, the court found that the company's upper

53

management and general counsel did not need to be consulted on these denials of tenders. Rather, the evidence showed Ms. Fisher's "decisions ultimately determined corporate policy in the area of additional insured endorsements and tenders of coverage under such endorsements. Even though Ms. Fisher was not employed directly by ASIC, this authority had been given to her by ASIC. ASIC cannot avoid responsibility by creating a company to handle claims and allowing the company and its managing agent, Ms. Fisher, to deny all AI claims. [¶] ASIC through its general counsel must have known of Ms. Fisher's conduct and adopted and approved her conduct after it occurred. The pattern of not accepting additional insured tenders has gone on for years and clearly was known to the officers and managing agents of ASIC." (Civ. Code, § 3294, subd. (b).)

Effectively, American Safety had been issuing AIEs while "knowing that coverage would never be honored and knowing that the additional insureds intended that they would be receiving a defense if they were sued in construction defect cases." The court concluded that this conduct was evidently done with the intent to cause injury to Pulte and amounted to despicable actions that were done with a willful and knowing disregard of Pulte's rights. Pulte was therefore required to use its own resources to defend itself in construction defect cases. There were admissions at trial that other such additional insureds had been provided a defense with a reservation of rights, while American Safety was filing declaratory relief actions to determine the correctness of its position and seeking return of the fees paid. This happened even though the financial condition evidence showed American Safety had a surplus of over $1 million.

The court accordingly found there was clear and convincing evidence, as stated in the judgment, that American Safety had inflicted economic harm on Pulte and this harm "was the result of intentional malice, trickery, or deceit." The court found the standards of Civil Code section 3294 had been satisfied, in that the denial letters included misrepresentations about applicable or inapplicable policy provisions that amounted to clear and convincing evidence of malice and oppression, and inexcusably showed "a pattern of using exactly the same language in the letters whether the provisions applied or not."

These substantive conclusions on Pulte's entitlement to receive punitive damages from American Safety are supported by substantial evidence. However, after the following discussion of the basis given for awarding *Brandt* fees in the amount of $471,313.52, we shall turn to the related issues about the amount of punitive damages awarded, $500,000. (Pt.VI, *post*.)

V

BRANDT *FEES*

The trial court issued its decision awarding Pulte *Brandt* fees of $471,313.52, plus *Brandt* costs of $38,587. (*White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 890 [such costs also allowable].) The judgment expressly states, "the law is clear that fee agreements can be changed and the modification to the fee agreement between Plaintiff and its counsel serves as the basis for the award of *Brandt* fees."

We emphasize that as to the contract damages we have previously discussed, the trial court did not refer in the judgment or its decisions to the differing fee agreements

55

that Pulte had reached with its counsel. American Safety challenges only the amount of the *Brandt* award as impermissibly based on a strategic or tardy posttrial modification of the original contingency fee agreement.

## A. Applicable Standards

*Brandt* allows an insured to recover attorney fees expended to enforce the policy, when the insurer has withheld policy benefits in bad faith. Such recoverable fees may not exceed the amount attributable to obtaining benefits due under the contract. (*Brandt, supra,* 37 Cal.3d at pp. 817, 819.) Fees attributable to obtaining any portion of the award in excess of the amount due under the policy are not recoverable. (*Ibid.*) *Cassim*, *supra*, 33 Cal.4th 780 requires such an allocation between *Brandt* and non-*Brandt* work, even where there is a contingency fee agreement.

As explained in *Track Mortgage Group, Inc. v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 867-868, the practical effect of these rules is that the trial court can only award such *Brandt* fees as were expended in enforcing the policy, but not those expended in proving the insurer's bad faith. The parties must provide showings to aid the court in segregating the fees and determining which were expended to compel payment of policy benefits. (*Ibid.*) In that case, the billings could not be easily segregated, and the court instead made a proportional estimate of what the case was worth "based upon the results, based upon the complexity of the case, based upon the experience of counsel, and having tried the case . . . and recognizing the issues and the sophistication that those issues demanded . . . ." (*Id.* at p. 867.)

*Cassim* teaches us, "Defendants are protected from excessive *Brandt* fees in two ways. First, as in any tort case, the plaintiff bears the burden of proving by a preponderance of the evidence both the existence and the amount of damages proximately caused by the defendant's tortious acts or omissions. [Citation.] Accordingly, on remand, plaintiffs will bear the burden of demonstrating how the fees for legal work attributable to both the contract and the tort recoveries should be apportioned. [Citation.] [¶] Second, trial courts retain discretion to disregard fee agreements that appear designed to manipulate the calculation of *Brandt* fees to the plaintiff's benefit. For example, a client who enters a fee agreement in an insurance bad faith case in which an attorney will take 40 percent of the entire compensatory damage award as his fee for working to obtain the contract recovery, and agrees to work on the tort recovery pro bono, cannot expect to receive *Brandt* fees of 40 percent of the entire compensatory award." (*Cassim*, *supra*, 33 Cal.4th 780, 813.)

In the case of a contingency fee arrangement, *Cassim*, *supra*, 33 Cal.4th 780, explains the proper method of calculating *Brandt* fees. The trier of fact must determine the percentage of the legal fees paid to the attorney that reflects the work attributable to obtaining the contract recovery:

> "Some outer limits are immediately discernible. First, no portion of legal fees attributable to the punitive damage award can be recovered as *Brandt* fees. *Brandt's* focus was solely on ensuring that attorney fees for contract recovery did not diminish a plaintiff's compensatory damages award, and did not concern diminution of the punitive damages award, which is essentially a windfall for plaintiffs that the law permits for public policy reasons. Second, the *Brandt* fees can never exceed the legal fees for the combined tort and contract recovery; in most cases the amount will be far less. [¶] To

determine the percentage of the legal fees attributable to the contract recovery, the trial court should determine the total number of hours an attorney spent on the case and then determine how many hours were spent working exclusively on the contract recovery. Hours spent working on issues jointly related to both the tort and contract should be apportioned, with some hours assigned to the contract and some to the tort. This latter figure, added to the hours spent on the contract alone, when divided by the total number of hours worked, should provide the appropriate percentage." (*Cassim, supra*, 33 Cal.4th at p. 812.)

In general on attorney fee agreements, "[i]t is axiomatic that the parties to an agreement may modify it. The precise meaning of terms used in a contract is that which is understood by the parties to the contract. The court will not impose its own interpretation at variance with the parties' intention. Here, there is no dispute between plaintiff and her attorney concerning what they both intended when the contract was written. A contingency fee contract may be modified by the parties at any time during the subject litigation." (*Vella v. Hudgins* (1984) 151 Cal.App.3d 515, 519.)

In *Track Mortgage Group, Inc.*, *supra*, 98 Cal.App.4th at pages 867 to 868, the appellate court applied an abuse of discretion standard and upheld the trial court's determination on what was a reasonable *Brandt* fee for enforcing the contract, based upon stated factors and the result. (*Id.* at p. 868.) It relied on familiar principles, " 'The trial court is the best judge of the value of professional services rendered in its court . . . .' [Citation.] The only proper basis for reversal of a fee award is an award so large or small that it shocks the conscience and suggests that passion or prejudice influenced the result." (*Ibid.*)

58

## B. Proceedings at Trial

The *Brandt* fees were vigorously litigated. It was not disputed that Pulte's original fee arrangement from 2013 was to pay its attorneys on a contingency basis. The trial court held several hearings at which *Brandt* fees were discussed in terms of American Safety's argument the Pulte fee agreement was manipulated posttrial. In December 2015, shortly after the court issued its substantive decision on entitlement to contract damages and to bad faith recovery, the court held a scheduling hearing and admitted the Pulte contingency fee agreement (a letter of April 5, 2013) into evidence.

At a subsequent hearing on January 15, 2016, the court estimated that as of that time, Pulte's contract damages had been proven to be about $400,000 ($421,878.15 was being claimed, including prejudgment interest). The court inquired whether a one-third contingency fee would accordingly amount to a de minimis award (about $150,000). Pulte's counsel responded that the actual figure it was claiming for the expense of pursuing the contract claims, as shown by its billing records, was more like $680,000 in attorney fees, and argued that none of the trial witnesses had said that the amount was unreasonable. American Safety's attorney responded that the court would still be applying two ratios: the one-third contingency ratio set by the fee agreement, and the second ratio as set by allocating the tort versus contract recovery. The court agreed that "whatever I found would impact it if I use a *Cassim* formula."

At that point, American Safety's calculations were that Pulte could obtain only $174,401.44 in fees incurred directed toward obtaining benefits under the contract. That would also be its proposed base amount for calculation of punitive damages purposes.

59

Later in the proceedings, American Safety revised its calculations to state that the *Brandt* fees should be around $371,000.

Next, at the January 15, 2016 hearing, the court observed that this was not a case in which an individual insured would be recovering large emotional distress damages, but instead it was focused on corporate conduct. The court outlined the procedure to be followed for the remaining portion of trial: "Notwithstanding my findings of what the insurance company did, I'm only focusing on the damages part. . . . And so I'm just -- I'm struggling with how to make -- to, as I must, follow the direction of the Supreme Court [*Cassim*] and figure out how it applies in this case. [¶] So I need to take it under submission because I need to look at allocations. And then after I do that, I need to decide whether I'm going to use the *Cassim*-type formula or some other basis for the calculation."

Pulte then filed, along with its trial brief filed February 9, 2016, declarations from its house counsel and third party claims administrator about its recent agreement to modify the prior attorney fee arrangement, such that "Pulte has now incurred and paid all attorneys' fees and costs in this action through January 31, 2016, on an hourly basis at the rates reflected on the invoice submitted to the Court during trial (Exhibit 453) and pursuant to the supplemental invoices submitted herewith." Pulte contended that such a modification to the fee agreement was necessary "[in] order to avoid having Pulte and/or its counsel deprived of the full measure of the reasonable fees and costs actually required to pursue this contentious action." Pulte cited to cases that had recognized some parties' rights to modify a prior contingent fee arrangement, such that a subsequent award based

on a reasonable hourly rate is allowable.  (*Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478, 505 [where a modified agreement was reached, "the trial court could properly find that the arrangement was no longer a purely contingent one"]; *Vella v. Hudgins*, *supra*, 151 Cal.App.3d 515, 519.)  Pulte now claimed its total attorney fees and costs incurred were $769,101.80, as shown by its records of billings.  Once the bad faith attorney fees and costs portion ($123,589.20) was properly deleted, Pulte argued the *Brandt* fees and costs should amount to $645,463.10.  American Safety objected that the new declarations were posttrial evidence and should not be considered.

The trial court began the February 11, 2016 hearing by characterizing the issues surrounding the *Brandt* fees.  "I guess the elephant in the room to address first is the change in the fee agreement.  So let's talk about that."  After some colloquy, the court determined that the respective calculations and proposals by the parties were as follows.  American Safety suggested that the *Brandt* fees should be about $371,000, while Pulte requested $645,000 and had submitted invoices to show the time spent between May 2013 and October 2015.  With those two positions in mind, the trial court stated that it understood the arguments and principles in *Cassim*, "but I'm going to allow the actual fees incurred."  The court observed that trial took place in phases:  "And I don't think that the evidence in the punitive damage portion or the arguments would be different depending on whether I award 300- or 600,000 because you're arguing about ratios and that sort of thing."

The court rejected American Safety's argument that the recent change in Pulte's fee agreement was "nothing but a manipulation of the process, and neither Pulte nor [it's

law firm] should be rewarded for it."  The court responded with this ruling, "All right.  I think the law is clear that fee agreements can be changed.  There are ethical issues.  And typically it's the client that challenges and typically the change is from an hourly to a contingency at the last minute by the lawyer and that's challenged, but when there's an anticipation of a very large settlement or verdict.  That is not before me.  And it looks like Mr. Laramie is an attorney; so that does seem proper.  [¶] The courts consistently talk about the fees incurred, which is the dilemma, or whatever you want to call it, addressed by *Cassim* and some of the other cases where the issue is what fees are or will be incurred by the plaintiff to obtain the contract benefits.  It is before the Court, and admittedly late, but it's now clear that Pulte has incurred these fees, whatever it is, $645,000 of fees, and I think I have to therefore consider that.  So I'm going to base my award of *Brandt* fees on the fees incurred.  What I want to talk about now is allocation."

Following the hearing, the court issued its decision on *Brandt* attorney fees and punitive damages.  The trial court found that neither of the proposed tort/contract allocations offered by the parties was reliable and the court was going to make its own percentage allegations, based on the hourly billings.   The court was able to reach a determination that the *Brandt* fees due for the pretrial portion of trial ($480,000 billed) amounted to approximately $396,875 in *Brandt* fees, once appropriate deductions were made.  Since most of the trial period had been spent on tort matters, only $75,000 out of the $200,000 billed for trial was recoverable as *Brandt* fees.  The total to be awarded was $471,313.52.

## C. Analysis of Award

American Safety objects to the conclusions reached by the trial court. Under its preferred analysis, American Safety would itemize as follows: Using a weighted average of 72 percent of all fees as attributable to contract claims (the *Brandt* fee work, for both pretrial and trial services), the court should have set the total contingent fee at $428,840. On that basis, American Safety would apply *Cassim, supra*, 33 Cal.4th 780, and reduce the total contingent fee in the same contract/tort proportion, which would translate to *Brandt* fees of $308,765. American Safety denotes the existing award to be a $162,549 increase over the contingent fee calculation.

We are aware that the trial court's award of *Brandt* fees was made after extensive briefing and argument between December 2015 and February 2016, about the reasonable value of services attributed to the causes of action for which *Brandt* attorney fees were allowed. Pulte did not explain exactly when it decided to modify its fee agreement with counsel, except for providing declarations dated February 9, 2016, after trial, from its house counsel Laramie and its third party claims administrator Macy. Laramie stated Pulte had decided more compensation for counsel was needed, in response to significant work made necessary by the opponent's "sharp tactics" throughout the litigation, and the results achieved by counsel. Macy reviewed invoices and wrote the checks.

We have serious concerns that this change in Pulte's fee agreement was apparently "designed to manipulate the calculation of *Brandt* fees to the plaintiff's benefit." (*Cassim, supra*, 33 Cal.4th at p. 813.) Even accepting that the trial court has broad discretion in the area of fee awards, this was not a case in which the type of contractual

63

negotiations between attorney and client is the main concern. For example, the court in *Vella,* in approving a renegotiated fee agreement, was focusing on the understanding of the parties to the contract, and stated, "[t]he court will not impose its own interpretation at variance with the parties' intention," measured by the time that the contract was written. (*Vella v. Hudgins, supra*, 151 Cal.App.3d at p. 519.) The outcome of allowing this contingency fee contract to be modified by the parties, after trial, primarily affects not their own understandings but instead American Safety, which is now on the hook for more than it anticipated.

The trial court's understanding that fee arrangements can normally be changed did not accurately take into account the strict principles of *Brandt*, which are to ensure that such a fee award reflects only those fees "attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract." (*Brandt, supra,* 37 Cal.3d at p. 819, cited in *Cassim, supra*, 33 Cal.4th at p. 813.) *Brandt* fees, as tort damages against the insurer, are premised on the unreasonable denial of policy benefits and the consequent fees incurred. (*Griffin Dewatering Corp., supra*, 176 Cal.App.4th at p. 220.) Because of the extent of exposure American Safety had to any kind of liability throughout trial, the fee arrangement in effect during trial should have controlled over the recent changes to it. Under these standards, we cannot find the trial court took all the appropriate factors into account in awarding *Brandt* fees. Although its decision to award fees as damages pursuant to *Brandt* was substantively justified, we must remand the case to the trial court for recalculation of the proper amount on the original contingency basis.

## VI

### *PUNITIVE DAMAGES AWARD: AMOUNT ONLY*

In determining whether a punitive damages award is excessive under California law, the courts consider factors such as the reprehensibility of the defendant's conduct, the amount of compensatory damages or actual harm suffered by the plaintiff, and the financial condition of the defendant. (*Bullock v. Philip Morris USA, Inc.*, *supra*, 159 Cal.App.4th at p. 690, fn. 18; *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1337.) The court addressed each of these factors in its decision, and awarded $500,000 in punitive damages, noting this was a roughly proportional amount on a one-to-one ratio to the compensatory damages (calculated by the court as the *Brandt* fees in the amount of $471,313.52, together with *Brandt* costs of $38,587). We find no fault with the court's consideration of the appropriate punitive damage factors, as above.

However, in view of the factual showing about the nature of the fee arrangement in effect during trial, a differently calculated award of *Brandt* fees should be rendered on remand. Under the principles discussed above, the trial court must adjust the punitive award accordingly to maintain the approximate one-to-one ratio. (See *Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363, 368 ["In determining whether a punitive damages award is unconstitutionally excessive, *Brandt* fees may be included in the calculation of the ratio of punitive to compensatory damages, regardless of whether the fees are awarded by the trier of fact as part of its verdict or are determined by the trial court after the verdict has been rendered."].)

65

DISPOSITION

The judgment is reversed in part, solely with respect to the order awarding *Brandt* fees and the resultant punitive damages award, with directions to the trial court to allow such further proceedings as necessary to recalculate the award in accordance with Pulte's originally effective contingency fee agreement, and then to impose a like amount of punitive damages; the balance of the judgment is affirmed, including the entitlement orders on compensatory and punitive damages.  Costs on appeal to Pulte.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

DATO, J.